[No. S025423. June 24, 1999.]

THE PEOPLE, Plaintiff and Respondent, v.
RICKY LEE EARP, Defendant and Appellant.

**COUNSEL**

Robert S. Gerstein and Dean R. Gits, under appointments by the Supreme Court, for Defendant and Appellant.

Daniel E. Lungren and Bill Lockyer, Attorneys General, George Williamson, Chief Assistant Attorney General, Carol Wendelin Pollack, Assistant Attorney General, Susan D. Martynec, Robert S. Henry, Sharon Wooden Richard, Mary Sanchez and William H. Davis, Jr., Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**KENNARD, J.**—Defendant appeals his conviction by jury verdict of one count of first degree murder (Pen. Code, § 187; unless otherwise stated, all further statutory references are to this code), with three felony-murder special circumstances: murder in the commission of rape, of sodomy, and of a lewd or lascivious act upon a child less than fourteen years old (§ 190.2, former subd. (a)(17)(iii), (iv), and (v)). The jury returned a penalty verdict of death. This appeal is automatic. (§ 1239, subd. (b).)

### I. FACTS AND PROCEEDINGS

#### A. *Prosecution's Guilt Phase Case*

In August 1988, defendant was living with his girlfriend, Virginia Mac-Nair, at her house in Palmdale, located in the Antelope Valley area of Los Angeles County. The two often cared for Amanda Doshier, the eighteen-month-old daughter of their friend, Cindy Doshier. On August 22, Doshier left Amanda with MacNair and defendant for a few days. Over the next couple of days, MacNair changed the baby's diapers several times but did not notice any bruising, redness, or swelling in the anal or vaginal area.

On Thursday, August 25, around 7:00 a.m., MacNair went to work, leaving Amanda with defendant. Shortly before 3:00 p.m., defendant telephoned MacNair. He seemed frantic. Defendant mentioned something about the couple's dog, "Buster," and he said that Amanda was "not doing well" and that her breathing was "shallow." MacNair suggested that defendant check the baby's pulse and "shake her," and that he phone the paramedics.

About 3:00 p.m., Los Angeles County firefighter Daniel Elkins arrived at MacNair's Palmdale home in response to a radio call regarding an injured child. Elkins was met at the door by a young man who told him that the baby had fallen down the stairs. Elkins determined that the child was not breathing. He started cardiopulmonary resuscitation (CPR), but stopped to check for vital signs. He detected no pulse and noticed that the baby's lips were blue. Figuring he "could not do much" because the paramedics had not

arrived and he had no medical equipment, Elkins decided to take the baby to the hospital in the fire truck.

Just after the fire truck left with Amanda, Kaylene Oliver, a neighbor, saw defendant walk away from MacNair's house toward 20th Street. As defendant passed, Oliver asked about the baby; defendant said something about "the heat" doing "that" "to her."

Sometime in the afternoon of August 25, defendant telephoned Terry Dickerson, a coworker on a construction painting crew, and asked for a ride. On his way to MacNair's house, Dickerson saw defendant walking down 20th Street. Dickerson took defendant to his mobilehome, where they watched television. When Dickerson asked about Amanda, defendant said she was with a babysitter.

After defendant's frantic call, Virginia MacNair left work and drove to Palmdale Hospital Medical Center, the hospital nearest her home, where she assumed Amanda had been taken. There she was interviewed by Deputy Sheriff Michael McNeil, who was looking into the cause of Amanda's injuries. Deputy McNeil and two other deputies accompanied MacNair to her house, where she consented to a search. The deputies recovered various items including a bloodstained pillow from the living room couch. Deputy McNeil told MacNair that Amanda had been severely beaten and molested, and another deputy sheriff said something about "sodomy."

Around 6:00 or 6:30 on the evening of August 25, defendant telephoned MacNair at home and asked about Amanda. MacNair said that Amanda was not doing well. She also told him about the search of the house, and that the deputy sheriffs had said that Amanda had been sexually abused.

About 8:00 p.m., MacNair went to Kaiser Hospital on Sunset Boulevard in Hollywood where Amanda was being airlifted by helicopter. At the hospital, Detectives Edwin Milkey and George Roberts of the Los Angeles County Sheriff's Department questioned MacNair. Later, Milkey and Roberts served a search warrant at MacNair's house and recovered a bloody paper napkin and some bedding.

Defendant spent the evening of August 25 at Terry Dickerson's mobilehome playing cards with Dickerson and two other friends, Mike and Colleen Levis. Colleen asked about Amanda, who she knew had been staying with defendant and MacNair. Defendant told her he had left Amanda with a babysitter. About 9:00 p.m., Mike Levis's mother telephoned and said that the police were at her house looking for defendant. When Colleen asked

defendant why the police would be looking for him, he replied that his dog had knocked Amanda down the stairs. Later, defendant asked Colleen if a doctor could tell that a baby had been sexually molested just by looking at it.

Around 2:00 a.m., Dickerson drove Colleen Levis to her mother-in-law's house; he then returned to his mobilehome. A half hour later, Colleen telephoned her husband, Mike, at the mobilehome to tell him that police officers had twice come by his mother's house looking for defendant and that they said that Amanda had been "mutilated." Mike related this information to defendant. A few minutes later, Colleen called again and said that a "bunch of cops" were headed toward the trailer park. Defendant left immediately.

At 3:30 a.m. Friday morning, defendant arrived at the mobilehome of Patricia and Ron Avery, friends who lived in the same trailer park as Dickerson. Defendant explained that he had been driving around in a friend's car when he saw police cars and became worried because he had outstanding bench warrants. When Patricia asked after MacNair and Amanda, defendant gave her the impression that they were staying with someone in the San Fernando Valley. In the afternoon of Friday, August 26, at defendant's request, Ron Avery dropped defendant off in an area of the Antelope Valley where new houses were under construction.

That same afternoon, defendant called his mother, Helene Perusse, at her home in the Sacramento area and begged her to drive to Palmdale and get him. Perusse and her boyfriend, Ken Robson, did so the next day, Saturday, shortly after midnight. Defendant told them he was scared because he had violated his parole and was being blamed for "an accident" in which his dog had "knocked the baby down the stairs."

That Saturday morning, at 10:30 a.m., Amanda died.

The next day, at the request of defendant's mother, a church elder, James Lewis, who was also an attorney, met defendant at the Sacramento County Sheriff's office, where defendant turned himself in.

Medical examinations of baby Amanda established the following: severe bruising in the anal area; blood in the vaginal and rectal areas. The rectum showed small lacerations or tears; the vagina was gaping, which was inconsistent with the normal vagina of a 18-month-old girl, suggesting probing or poking with some object. There was "retinal hemorrhaging" or bleeding eyeballs, a condition associated with "shaken baby syndrome."

Dr. Eva Hauser, a medical examiner with the Los Angeles County Coroner's Office, performed an autopsy on baby Amanda. Dr. Hauser found

bruising near the anal opening and stretched-out muscles surrounding the anus, both indicative of sexual assault. The interior of the anus had dark purple bruising, and there was hemorrhaging in the soft tissues inside Amanda's body between the vaginal and rectal areas. These injuries were consistent with blunt force trauma by a human penis either inside the rectum or inside the vagina, but were inconsistent with force applied outside the body. Other blunt force trauma injuries present near the vaginal opening were consistent with sexual penetration, although not necessarily vaginal penetration. Dr. Hauser attributed Amanda's death to two factors: multiple sharp impacts to the top of the head and severe shaking. She testified, "This baby was shaken about as forcefully as an adult can shake an infant." The injuries to the rectal and genital areas preceded the head injuries. All of the injuries were inflicted within six to eight hours, although they could have occurred in substantially less than six hours.

### B. *Defendant's Guilt Phase Case*

Defendant testified on his own behalf. He denied sodomizing, sexually molesting, or otherwise harming baby Amanda. He blamed one Dennis Morgan, who defendant claimed was present with him at MacNair's Palmdale house on August 25, 1988, just before Amanda lost consciousness.

Defendant had met Morgan at Susanville while defendant was serving time for burglary. After Morgan was paroled and moved to Los Angeles, he wrote and offered to help defendant find a job upon his release. Defendant was released on parole in May 1985, but his release was conditioned upon his remaining in the San Jose area. Shortly thereafter, defendant's parole officer gave him permission for a two-week visit to Los Angeles. There, defendant met up with Morgan, who got him a job in telemarketing. Defendant stayed in Southern California, using the alias "Ricky Belliche," and never again reported to his parole officer.

Through Morgan, defendant met Diane Ellison, with whom Morgan was living, as well as Ellison's daughter Cindy Doshier, and Virginia MacNair, who became defendant's girlfriend. Sometime in 1986, defendant moved in with MacNair at a house she bought in the Palmdale area of the Antelope Valley and he began working on a construction crew doing painting and drywall work.

In August 1988, MacNair was eight months pregnant with defendant's child. Defendant decided to take time off from work beginning August 22 so he could paint the room they planned to use as a nursery. On the evening of August 22, Cindy Doshier, who was having marital problems, dropped

Amanda off to stay with MacNair and defendant for a few days. Defendant looked after Amanda on the 23d and 24th while MacNair was at work. On the 24th, defendant's dog ran into Amanda and knocked her over. That same day Amanda "got stuck" on the stairs with her legs straddling the openings between the stair treads.

On August 25, MacNair left for work at 7:00 a.m. Throughout the morning, defendant painted the nursery. Around 12:30, Dennis Morgan came to the door. Defendant was surprised because he had not seen Morgan in nearly two years and Morgan had never before been to MacNair's Antelope Valley house. Morgan asked if defendant knew where to buy some heroin. Defendant said he did not, but supplied Morgan with a spoon so that Morgan could "shoot up." Defendant went upstairs to work on the nursery, leaving Morgan downstairs with Amanda. Sometime later, defendant saw Morgan spanking Amanda. Later still, defendant went to the backyard to wash his paintbrushes and stayed outside for between 25 and 30 minutes. When he came back inside, Amanda was lying at the foot of the stairs, unconscious. Defendant was very frightened and may have shaken Amanda. He phoned MacNair, who told him to dial "911." Just as defendant started to make the "911" call, Morgan left the house, muttering that he did not "need this shit."

After the fire truck left the house with Amanda, defendant started walking to the hospital but became alarmed when a marked police car stopped in front of MacNair's house. Defendant thought that the car might be connected to his parole violation, and that if he went to the hospital, his true identity would be found out. A few minutes later, defendant met his friend, Terry Dickerson, on 20th Street, and decided against going to the hospital.

Dennis Morgan also testified for the defense at trial. He had met defendant at the Susanville prison and helped defendant get a job after defendant's release. Morgan admitted being a heroin addict, having 19 different aliases, and being a bisexual who in prison had used the names "Dee Dee" and "Denise" and often wore makeup and curlers. Morgan had "told several people" that he and defendant "became lovers at Susanville." Morgan denied going to defendant's house on August 25, 1988, saying he did not know where defendant was living at that time. And he denied raping or molesting baby Amanda.

On cross-examination, Morgan testified that in October 1991 (after the trial began in this case), he ran into defendant in the Los Angeles County jail. Defendant asked Morgan to testify for him at the penalty phase of this case. Morgan was to say that he and a Hispanic man named Joe were at MacNair's house with defendant on August 25, 1988, when Amanda was

fatally injured. Defense investigator Paul Ford also approached Morgan and asked him to testify for defendant at the penalty phase, saying he "needed somebody who could place somebody else at the house" that day. Morgan also received a visit in jail from defense attorney Louis Bernstein, who served him with a subpoena to testify in this case. When Morgan entered the attorney visitor room, a $20 bill was on the table. Morgan assumed that Bernstein had put it there.

Douglas Ridolfi, a criminalist with the Los Angeles County Sheriff's Department, testified that he examined vaginal, oral, and rectal samples taken from Amanda and did not detect any semen, sperm, or seminal fluid. Ridolfi also examined items seized during the searches of MacNair's home and compared them with blood samples taken from defendant and Amanda. He determined that bloodstains on a pillow could have come from defendant, Amanda, and 52 percent of the population, and that bloodstains on a napkin were consistent with the blood types of defendant, Amanda, and 40 percent of the population.

### C. *Prosecution's Penalty Phase Case*

The prosecution introduced documentary evidence of defendant's prior felony conviction for burglary.

### D. *Defendant's Penalty Phase Case*

Defendant's aunt and mother testified that defendant's early childhood years were marked by family dysfunction. His father was an alcoholic who was physically abusive to his wife and emotionally abusive to his children. When defendant was five years old, his father suffered brain damage in a beating. He stopped working and the next year committed suicide. Defendant's mother remarried. Her new husband was an alcoholic who was violent to her and her children. As a young teenager, defendant started to get into trouble with the law and spent time at juvenile hall. At the age of 16, defendant was sent to the California Youth Authority.

Gloria Carl, a juvenile hall cook who had befriended defendant, testified that he was awarded honor status at that facility. She believed that as a youth defendant committed crimes to get attention and because he lacked structure in his life.

Virginia MacNair testified that she and her baby, defendant's son born in 1988, often visited defendant in jail, and that defendant had sent them letters and enclosed pictures he had drawn.

James Park, who had been associate warden at San Quentin prison for two years and employed in the prison system for some forty years, expressed the view that defendant would pose no danger in a high security prison and that defendant's artistic talent would assist him in adjusting to life in prison.

## II. JURY SELECTION: ADEQUACY OF VOIR DIRE

The trial court indicated it would conduct voir dire pursuant to then newly enacted section 223 of the Code of Civil Procedure. That section provides that in a criminal case the court "shall conduct the examination of prospective jurors," but that the parties "upon a showing of good cause" may "supplement the examination." Consistent with this procedure, the court decided to have prospective jurors give written answers to questions in a jury questionnaire. The defense offered its own questionnaire, which included a series of questions pertaining to each prospective juror's experience with and attitudes about child molestation.[1] Defense counsel argued that questions about each prospective juror's "background, relatives, friends, associates, feelings" on the subject of child molestation were necessary to enable the defense to intelligently exercise its challenges for cause.

The trial court refused to use defendant's proposed questions. The court's jury questionnaire did have this general question regarding juror experience with crime and the criminal justice system: "Have you or any close friend or relative ever been involved in a criminal incident or case either as a <u>victim</u>, <u>suspect</u>, <u>defendant</u>, <u>witness</u>, or <u>other</u>?" (Original underscore.) The court's questionnaire also included questions about child molestation. After explaining that defendant was charged with "sexual misconduct involving the death of a child," prospective jurors were asked: "In light of this, do you know any reason why you would not be a completely fair and impartial juror in this case?" In addition, the questionnaire described the capital sentencing process and then posed a series of inquiries to be answered in light of "the charges

---

[1]Defendant's proposed questionnaire included these questions: "Have you or a family member, or someone else close to you, ever been the victim of any sexual offense?" "Has any child of yours ever been the victim of a sex crime or child molestation?" "Have you ever been involved in any way in a child molestation case, whether prosecuted or not?" "Do you personally know any relative, friend, or co-worker who has been accused of sexual or physical abuse of either a child or an adult?" "Have you ever suspected that your child has been the victim of a sex crime or child molestation?" "Have you ever suspected anyone you know as being a child molester?" "Do you believe the people charged in the McMartin Preschool case were guilty of child molestation?" "How do you feel about sitting on a case such as this that deals with child molestation?" In addition, the proposed questionnaire asked each prospective juror to indicate whether the juror strongly agreed, agreed, was neutral, disagreed, or strongly disagreed with this statement: "Because a special circumstance allegation involves a sexual molestation of a child, it is more likely than not that you [*sic*] would vote to impose the death penalty."

against defendant relating to allegations of sexual misconduct involving the death of a child." For instance, each prospective juror was asked whether because of the nature of the charges the juror would "automatically refuse to vote in favor of the penalty of death and automatically vote for a penalty of life imprisonment without the possibility of parole?" or conversely, would "automatically refuse to vote in favor of the penalty of life imprisonment without the possibility of parole and automatically vote for a penalty of death?" (Original underscore.)

After reviewing the completed questionnaires, defense counsel observed that only one of the one hundred and four prospective jurors had revealed a personal experience with child molestation. He noted that this constituted less than 1 percent of the total number of prospective jurors, and that according to scientific studies, between 6 and 38 percent of the general population reportedly have been victims of child molestation. He attributed the disparity in this case to the trial court's refusal to question the prospective jurors regarding personal or family experience with child molestation. Defendant renewed his request for such questions to the prospective jurors. Again, the trial court refused to do so. Defendant now contends that this refusal violated the Sixth, Eighth, and Fourteenth Amendments to the federal Constitution and article I, sections 15 and 16 of the California Constitution. We disagree.

■ We have long recognized that "[t]he right to unbiased and unprejudiced jurors is an inseparable and inalienable part of the right to a trial by jury guaranteed by the constitution." (*Lombardi* v. *California St. Ry. Co.* (1899) 124 Cal. 311, 317 [57 P. 66].) "Voir dire plays a critical function in assuring the criminal defendant that his Sixth Amendment right to an impartial jury will be honored. Without adequate voir dire the trial judge's responsibility to remove prospective jurors who will not be able impartially to follow the court's instructions and evaluate the evidence cannot be fulfilled." (*Rosales-Lopez* v. *United States* (1981) 451 U.S. 182, 188 [101 S.Ct. 1629, 1634, 68 L.Ed.2d 22], italics omitted.) Yet, trial courts have "great latitude in deciding what questions should be asked on voir dire." (*Mu'Min* v. *Virginia* (1991) 500 U.S. 415, 424 [111 S.Ct. 1899, 1904, 114 L.Ed.2d 493], italics omitted.)

■ In a state such as California that in capital cases provides for a sentencing verdict by a jury, "the due process clause of the Fourteenth Amendment of the federal Constitution requires the sentencing jury to be impartial to the same extent that the Sixth Amendment requires jury impartiality at the guilt phase of the trial." (*People* v. *Williams* (1997) 16 Cal.4th 635, 666 [66 Cal.Rptr.2d 573, 941 P.2d 752], citing *Morgan* v. *Illinois*

(1992) 504 U.S. 719, 726-728 and 740 [112 S.Ct. 2222, 2228-2229, 2235-2236, 119 L.Ed.2d 492] (dis. opn. of Scalia, J.) [clarifying the constitutional underpinnings of the *Morgan* holding].) California's Constitution provides an identical guarantee. (*People* v. *Williams, supra,* at p. 666; see *People* v. *Johnson* (1992) 3 Cal.4th 1183, 1210-1211 [14 Cal.Rptr.2d 702, 842 P.2d 1]; *People* v. *Gordon* (1990) 50 Cal.3d 1223, 1248, fn. 4 [270 Cal.Rptr. 451, 792 P.2d 251].)

As we explained in *Williams,* "[w]hen a prospective juror's views about the death penalty 'would "prevent or substantially impair the performance of his [or her] duties as a juror" ' (*Wainwright* v. *Witt* (1985) 469 U.S. 412, 424 [105 S.Ct. 844, 852, 83 L.Ed.2d 841]), the juror is not impartial and may be challenged 'for cause.' " (*People* v. *Williams, supra,* 16 Cal.4th at p. 667; see *People* v. *Danielson* (1992) 3 Cal.4th 691, 712 [13 Cal.Rptr.2d 1, 838 P.2d 729] [noting the same test applies when the prosecution challenges jurors opposed to capital punishment that governs defense challenges to those favoring capital punishment].) We have also held that "[a] prospective juror who would invariably vote either for or against the death penalty because of one or more circumstances likely to be present in the case being tried, without regard to the strength of aggravating and mitigating circumstances, is . . . subject to challenge for cause . . . ." (*People* v. *Kirkpatrick* (1994) 7 Cal.4th 988, 1005 [30 Cal.Rptr.2d 818, 874 P.2d 248].)

Consequently, to preserve the right to a fair and impartial jury on the question of penalty, the death qualification process must probe "prospective jurors' death penalty views as applied to the general facts of the case, whether or not those facts [have] been expressly charged." (*People* v. *Kirkpatrick, supra,* 7 Cal.4th at p. 1005; *People* v. *Clark* (1990) 50 Cal.3d 583, 597 [268 Cal.Rptr. 399, 789 P.2d 127] [noting that death penalty voir dire "seeks to determine only the views of the prospective jurors about capital punishment in the abstract"].)

Here the trial court's voir dire procedure fully satisfied the requirements of the state and federal Constitutions that a fair and impartial jury determine questions of guilt and of penalty. The jury questionnaire mentioned that the charges against defendant pertained to "sexual misconduct involving the death of a child," and it inquired of each prospective juror whether those charges would have any effect on the juror's ability to be fair and impartial. And, after describing the sentencing process in a capital case, the questionnaire asked whether "the charges against defendant relating to allegations of sexual misconduct involving the death of child" would have any effect on the juror's sentencing decision. Answers to these questions provided an adequate basis for the trial court and counsel to determine

whether a prospective juror's views or attitudes about child molestation would prevent the juror from impartially deciding defendant's guilt (*Mu'Min* v. *Virginia, supra,* 500 U.S. at p. 430 [111 S.Ct. at pp. 1907-1908]; *Patton* v. *Yount* (1984) 467 U.S. 1025, 1035 [104 S.Ct. 2885, 2891, 81 L.Ed.2d 847]) or would cause the juror to "invariably vote either for or against the death penalty because of . . . circumstances . . . present in the case being tried" (*People* v. *Kirkpatrick, supra,* 7 Cal.4th at p. 1005).

■ Defendant nevertheless insists that the more specific questions he had proposed regarding the jurors' personal experience with and attitudes about child molestation were constitutionally compelled in this case. He invokes a line of United States Supreme Court authority requiring the questioning of prospective jurors on racial prejudice in certain cases in which the defendant and the victim belong to different racial or ethnic groups. The high court first imposed this requirement as part of its supervisory power over lower federal courts. (See *Aldridge* v. *United States* (1931) 283 U.S. 308 [51 S.Ct. 470, 75 L.Ed. 1054, 73 A.L.R. 1203] [holding it was reversible error for a federal court to fail to inquire into racial prejudice in a case involving a Black defendant accused of killing a White police officer]; see also *Rosales-Lopez* v. *United States, supra,* 451 U.S. 182, 192 [101 S.Ct. 1629, 1636] [concluding that a federal court must inquire about racial prejudice "when requested by a defendant accused of a violent crime and where the defendant and the victim are members of different racial or ethnic groups"].) The court has held that in state court actions the federal Constitution imposes a similar obligation when the factual circumstances of the case raise a "reasonable possibility" that racial prejudice could influence the jury. (See *Ham* v. *South Carolina* (1973) 409 U.S. 524 [93 S.Ct. 848, 35 L.Ed.2d 46] [reversible error to fail to question prospective jurors on racial prejudice in the trial of a Black civil rights activist charged with marijuana possession when the defendant intended to raise the defense that he had been framed due to his civil rights activities]; but see *Ristaino* v. *Ross* (1976) 424 U.S. 589 [96 S.Ct. 1017, 47 L.Ed.2d 258] [no factors comparable to those in *Ham* required questioning on racial prejudice in trial of Black defendant charged with attempted murder of White security guard].) Most recently, in *Turner* v. *Murray* (1986) 476 U.S. 28 [106 S.Ct. 1683, 90 L.Ed.2d 27], involving a Black defendant sentenced to death for killing the White owner of a jewelry store during a robbery, the high court held that, upon request, "a capital defendant accused of an interracial crime is entitled to have prospective jurors informed of the race of the victim and questioned on the issue of racial bias." (*Id.* at pp. 36-37 [106 S.Ct. at p. 1688].) The court explained that because of the range of discretion a jury has in determining a capital defendant's sentence, "there is a unique opportunity for racial prejudice to operate but remain undetected." (*Id.* at p. 35 [106 S.Ct. at p. 1687].)

██ Here, however, racial prejudice was not in issue. Defendant is quick to point out, however, that some federal appellate decisions have suggested that the defense has a right to question prospective jurors not only about racial prejudice but also about other topics " 'concerning which either the local community or the population at large is commonly known to harbor strong feelings that may stop short of presumptive bias in law yet significantly skew deliberations in fact.' " (*United States* v. *Jones* (9th Cir. 1983) 722 F.2d 528, 529-530, quoting *United States* v. *Robinson* (D.C. Cir. 1973) 475 F.2d 376, 380-381 [154 App.D.C. 265].) Defendant contends that sexual molestation is such a topic.

Even if we were to agree with defendant in that regard, defendant suffered no denial of his constitutional rights as a result of the trial court's refusal to ask prospective jurors the particular questions defendant had proposed. As we noted earlier, a trial court "retains discretion as to the form and number of questions on the subject, including the decision whether to question the venire individually or collectively." (*Turner* v. *Murray, supra,* 476 U.S. at p. 37 [106 S.Ct. at p. 1689].) Here, the trial court's questionnaire asked each prospective juror whether the juror "or any close friend or relative [had] ever been involved in a criminal incident or case either as a victim, suspect, defendant, or witness" (underscore omitted). The questionnaire then informed the prospective jurors that the charge against defendant pertained to "sexual misconduct involving the death of a child" and asked whether that fact would adversely affect any juror's impartiality in deciding defendant's guilt or sentence. We conclude that, considered together, these questions sufficiently probed the attitudes and views of potential jurors about child molestation. The federal and state Constitutions require no more.

III. GUILT PHASE

A. *Asserted Doyle Error*

██ As stated at the outset, defendant testified at trial that Dennis Morgan was with him at the home of defendant's girlfriend, Virginia MacNair, on August 25, 1988, when defendant found 18-month-old Amanda unconscious at the bottom of the stairs, and that Morgan left just as defendant was telephoning the paramedics. Defendant also testified that when his mother and MacNair visited him in jail, he held a note up to the glass partition separating inmates from their visitors. The note read, "I wasn't the only one in the house that day." After that, he never mentioned the matter again on advice of his family and lawyers. In cross-examining defendant, the prosecutor asked why during the three-year period between August 25, 1988, when Amanda was taken to the hospital, until trial, defendant had not

mentioned to MacNair, his mother, or any of his friends that Dennis Morgan was a witness to the events of that day.[2] The prosecutor also raised this when cross-examining MacNair and again in closing argument to the jury.

Defendant contends that the prosecutor's conduct violated *Doyle* v. *Ohio* (1976) 426 U.S. 610 [96 S.Ct. 2240, 49 L.Ed.2d 91] (*Doyle*), which prohibits the prosecution from impeaching a defendant's trial testimony with evidence of the defendant's silence after the defendant, having been advised of his constitutional rights under *Miranda* v. *Arizona* (1966) 384 U.S. 436 [86 S.Ct. 1602, 16 L.Ed.2d 694, 10 A.L.R.3d 974] (*Miranda*), chooses to remain silent. Defendant points out that he had invoked the right to remain silent.

■ In *Doyle, supra*, 426 U.S. 610, 618 [96 S.Ct. 2240, 2245], the United States Supreme Court stated: "[W]hile it is true that the *Miranda* warnings contain no express assurance that silence will carry no penalty, such assurance is implicit to any person who receives the warnings. In such circumstances, it would be fundamentally unfair and a deprivation of due process to allow the arrested person's silence to be used to impeach an explanation subsequently offered at trial."

At issue in *Doyle* were comments by the prosecutor regarding the defendant's failure to tell *the police* the version of events about which the defendant ultimately testified at trial. ■ Assuming for the sake of argument that *Doyle* equally prohibits a prosecutor from commenting at trial on a defendant's failure to tell *friends and family* the version of events he testifies to at trial, here many of the prosecutor's questions and comments regarding defendant's failure to mention Dennis Morgan as a suspect to friends and relatives did not implicate *Doyle* at all because they pertained to defendant's silence on that topic *before* defendant was advised of and asserted the right to remain silent.[3] The prosecutor's inquiry pertained to a period that fell between Thursday, August 25, at 3:00 p.m., when baby Amanda lost consciousness and Sunday, August 28, when defendant surrendered to police.

[2]Defense witness Ken Robson, the boyfriend of defendant's mother, testified that when defendant learned of baby Amanda's death, he began walking in circles and said, "No one understands. I was not there alone," muttering under his breath the names "Terry" and "Dennis." But defendant's own testimony was to the contrary. According to defendant, other than the note he held up to the glass during the jailhouse visit with his mother and MacNair, he had never mentioned anyone else being in the house with him and Amanda because "it didn't seem important who was there."

[3]In this category are these questions to defendant: "Now, you didn't feel like you needed to tell anybody about Mr. Morgan so you didn't tell Terry Dickerson, right?" "You didn't need a witness so you didn't need or find any reason to tell Mike Levis, right?" "And you didn't feel you needed to tell Colleen Levis when you were confronted with this sexual assault of a child, right?" "And you didn't feel as you were talking to the Averys that you had any reason to say, 'Gosh, there was this guy there, this Dennis Morgan guy. He was there.' Right?" "And when you got to your mother, the lady that you went to to hide out, okay, when she became

Because the prosecutor's inquiry did not make use of "the arrested person's [post-*Miranda*] silence . . . to impeach an explanation subsequently offered at trial," *Doyle* was not implicated. (*Doyle, supra,* 426 U.S. 610, 618 [96 S.Ct. 2240, 2245].)

But other comments by the prosecutor regarding defendant's failure to mention Dennis Morgan as a suspect to his family and friends do appear contrary to the spirit if not the letter of *Doyle*. For instance, in cross-examining Virginia MacNair, defendant's girlfriend, the prosecutor asked, "At any time in the last three years has [defendant] said to you anything about 'I didn't do something'?" The prosecutor also asked MacNair, "So even after [defendant] is sitting there talking to you for all these hundreds of times [during jail visits], not one time did he confide in you about what happened in that house that day?" And during closing argument the trial court sustained a defense objection that the prosecutor violated *Doyle* in the following statement referring to the attorney who accompanied defendant when he turned himself in: "I can see Mr. Lewis, [defendant's] attorney [in Sacramento] . . . saying, 'Now, whatever you do, I want you to think about this, whatever you do, don't profess your innocence to your mother. And don't tell her that there was perhaps eyewitnesses that would make, that would prove that you are innocent. Don't tell her that.'"

We conclude, however, that any *Doyle* error did not prejudice defendant. On the facts of this case, the jury was unlikely to have focused on defendant's silence about Morgan *after defendant's arrest and receipt of Miranda warnings*. Defendant himself explained at trial why, during that period, he had not told his friends and family that Dennis Morgan was with him the day baby Amanda was fatally injured. Defendant testified that during a jailhouse visit with his mother and MacNair he held up a note stating he was "not alone" on the day Amanda was injured. He explained, however, that he did not name Morgan as the person who was with him that day and that he had not further discussed the matter until trial because he was acting on advice of counsel.

The prosecutor's references to defendant's failure to mention Dennis Morgan while in jail awaiting trial on this case were not what thoroughly impeached defendant's trial testimony about Morgan's visit to MacNair's house on the day baby Amanda lost consciousness. Rather, what thoroughly impeached defendant's testimony were the several versions of the cause of Amanda's injuries that he gave his family and friends right after Amanda

---

aware that you were wanted for rape, sodomy, and murder of a 17-month-old infant, did you feel the need to tell her, 'Mom, I've got a witness. I didn't do it, and I've got a witness who will say I was out cleaning paintbrushes'?"

lost consciousness and was rushed to the hospital. (Two days later, Amanda died at the hospital.) It was at that time, before defendant was advised of and invoked his right to remain silent, that he gave false and misleading stories to his girlfriend, his mother, firefighter Daniel Elkins, neighbor Kaylene Oliver, and defendant's friends Terry Dickerson, Mike and Colleen Levis, and Patricia Avery, about what had happened to baby Amanda. According to defendant, "Buster" the dog had knocked her down; she fell down the stairs; she was suffering from "the heat"; she was with another babysitter. Notably, none of these stories made any mention whatsoever of Dennis Morgan, who, according to defendant's trial testimony, had spanked Amanda just before she became unconscious. Accordingly, we are satisfied that any improper inquiry by the prosecutor regarding defendant's failure to tell friends and relatives about Morgan's involvement in Amanda's injuries, a version he ultimately offered at trial, could not have affected the jury's verdicts in this case. (*Chapman* v. *California* (1967) 386 U.S. 18, 24 [87 S.Ct. 824, 828, 17 L.Ed.2d 705, 24 A.L.R.3d 1065]; *People* v. *Crandell* (1988) 46 Cal.3d 833, 879 [251 Cal.Rptr. 227, 760 P.2d 423].)

## B. *Prosecutorial Misconduct*

■ Defendant contends that the prosecutor in cross-examination and argument engaged in a pattern of misconduct that denied defendant a fair trial. We disagree.

■ "Improper remarks by a prosecutor can ' "so infect[] the trial with unfairness as to make the resulting conviction a denial of due process." ' (*Darden* v. *Wainwright* (1986) 477 U.S. 168, 181 [106 S.Ct. 2464, 2471, 91 L.Ed.2d 144]; *Donnelly* v. *DeChristoforo* (1974) 416 U.S. 637, 642 [94 S.Ct. 1868, 1871, 40 L.Ed.2d 431]; cf. *People* v. *Hill* (1998) 17 Cal.4th 800, 819 [72 Cal.Rptr.2d 656, 952 P.2d 673].)" (*People* v. *Frye* (1998) 18 Cal.4th 894, 969 [77 Cal.Rptr.2d 25, 959 P.2d 183].) "But conduct by a prosecutor that does not render a criminal trial fundamentally unfair is prosecutorial misconduct under state law only if it involves ' "the use of deceptive or reprehensible methods to attempt to persuade either the court or the jury." ' " (*People* v. *Espinoza* (1992) 3 Cal.4th 806, 820 [12 Cal.Rptr.2d 682, 838 P.2d 204]; *People* v. *Price* (1991) 1 Cal.4th 324, 447 [3 Cal.Rptr.2d 106, 821 P.2d 610].) ■ "To preserve for appeal a claim of prosecutorial misconduct, the defense must make a timely objection at trial and request an admonition; otherwise, the point is reviewable only if an admonition would not have cured the harm caused by the misconduct." (*People* v. *Price, supra,* at p. 447; accord, *People* v. *Berryman* (1993) 6 Cal.4th 1048, 1072 [25 Cal.Rptr.2d 867, 864 P.2d 40].)

■ Here, because any harm could have been cured by an admonition, defendant's failure to make a timely objection and ask the court to admonish

the jury precludes him from now challenging as misconduct many of the questions and comments by the prosecutor that he cites as part of an asserted pattern of misconduct. In any event, upon consideration of both the objected to and unobjected to contentions, we discern no prejudicial misconduct by the prosecutor in this case.

### 1. *Prosecutor's questions implying facts*

During the prosecutor's cross-examination of defendant, the prosecutor asked the following question: "Well, isn't it true that after you raped and sodomized this child you tried to wipe her off and clean her up?"

Later in the cross-examination, this exchange took place:

[Prosecutor] Mr. Foltz: "Isn't it true that everything you're saying here for this jury is just the things as you want them to be?"

[Defense Counsel] Mr. Bernstein: "Objection. Argumentative."

The Court: "Sustained."

Mr. Foltz: "And isn't it true that you made up Dennis Morgan and the Dennis Morgan story as recently as October 1991?"

Mr. Bernstein: "Objection. Argumentative."

The Court: "Sustained."

Mr. Foltz: "Isn't it true that you decided that you had no defense unless you made up Dennis Morgan?"

Mr. Bernstein: "Objection. Argumentative."

The Court: "Sustained."

Mr. Foltz: "Did you make up Dennis Morgan?"

Defendant: "No."

Defendant now contends that these and similar questions that the prosecutor asked defendant and other witnesses constituted prosecutorial misconduct because the questions implied facts harmful to the defense.

We have held that a prosecutor commits misconduct by asking "a witness a question that implies a fact harmful to a defendant unless the

prosecutor has reasonable grounds to anticipate an answer confirming the implied fact or is prepared to prove the fact by other means." (*People* v. *Price, supra,* 1 Cal.4th at p. 481.) For a prosecutor's question implying facts harmful to the defendant to come within this form of misconduct, however, the question must put before the jury information that falls outside the evidence and that, *but for the improper question,* the jury would not have otherwise heard. (See *People* v. *Warren* (1988) 45 Cal.3d 471, 481 [247 Cal.Rptr. 172, 754 P.2d 218] [describing the gist of the misconduct as implying in the question "facts [the prosecutor] could not prove"].) Moreover, if "the prosecutor is not asked to justify the question, a reviewing court is rarely able to determine whether this form of misconduct has occurred." (*People* v. *Price, supra,* at p. 481.)

 In both instances set forth above, the prosecutor's questions were based on evidence already before the jury or inferences fairly drawn from that evidence. Therefore, there was no impropriety. We have examined the additional instances cited by defendant as improper questions by the prosecutor implying facts harmful to the defense. We conclude that they too were fairly derived from evidence already presented at trial, or that because of defendant's failure to request that the prosecutor make an offer of proof regarding the fact implied in the question, it is not possible to conclude from the record that, if asked, the prosecutor would not have been able to put forward evidence establishing the harmful implied fact.

### 2. *Prosecutor's questions about Helene Perusse's change in testimony*

At trial, defendant's mother, Helene Perusse, testified during the prosecution's case-in-chief that defendant telephoned her on Friday, August 26, 1988, at her home near Sacramento and asked that she drive to the Antelope Valley in Southern California and pick him up. Perusse and her boyfriend Ken Robson did so. Perusse admitted that at defendant's preliminary hearing she had given false testimony that defendant had "just turned up" at her front door on Sunday, August 28, 1988. According to Perusse, the version of events she related at the preliminary hearing was at defendant's suggestion that she tell it " 'that way' " so " 'there won't be any trouble for you guys.' "

After Perusse's testimony, the prosecutor called defendant's girlfriend, Virginia MacNair, as a witness. He asked her if she had been present at a meeting with Perusse and defense investigator Don Ingwerson that took place after the preliminary hearing and before trial. Defense counsel Bernstein objected to the question, citing the attorney-client privilege. (Evid. Code, § 954.) At a bench conference outside the jury's presence, the prosecutor explained he wanted to ask MacNair "if Mr. Ingwerson told Helene

during the course of that discussion to change her testimony from what she had previously testified to" in the preliminary hearing, adding "I don't believe that subordination [*sic*] of perjury is ever privileged." The trial court overruled defendant's objection. Defense counsel next asked for an offer of proof by the prosecutor "on what relevancy he has that there has been such perjury." He compared the situation to inquiring whether a witness had ever been convicted of a felony and proposed that the prosecutor ask MacNair the question outside the jury's presence. The prosecutor responded that Helene Perusse had testified that she had changed her story sometime after the preliminary hearing and "after she had talked to [defense] counsel in this matter." The prosecutor added: "Now, that doesn't suggest that it's counsel that in fact caused her to change that. But I think it opens it for inquiry as to who may have, and if there was a contact by Mr. Ingwerson at some time after the preliminary hearing and prior to her testimony here, then I think it's relevant." The trial court ruled there was "sufficient basis to ask that question." The following colloquy then took place before the jury.

Mr. Foltz: "Now, with regard to the last question. At any time while you were present and Mr. Ingwerson was talking to Ms. Perusse in your presence—"

Ms. MacNair: "Uh-huh."

Mr. Foltz: "—did he ever ask her or tell her to change her testimony from the preliminary hearing?"

Ms. MacNair: "Um, let's see. I think he arrived at the house prior to me being there because I was at work so he was there before I arrived. So if they spoke I don't know what they spoke about."

Mr. Foltz: "I am only asking you what you overheard while you were present."

Ms. MacNair: "No, I don't remember hearing about that."

Defendant argues the prosecutor committed misconduct in asking MacNair whether she had heard the defense investigator's asking or telling Perusse to change her testimony. "A prosecutor is not guilty of misconduct when he questions a witness in accordance with the court's ruling." (*People v. Rich* (1988) 45 Cal.3d 1036, 1088 [248 Cal.Rptr. 510, 755 P.2d 960].) That is what the prosecutor did here. Before the prosecutor's inquiry of MacNair, the trial court in a bench conference outside the jury's presence expressly allowed the prosecutor to conduct the questioning in issue.

### 3. *Prosecutor's insinuation of possible subornation of perjury*

Defendant contends the prosecutor committed misconduct by insinuating in his cross-examination of defense witnesses that members of the defense team had encouraged false testimony. As one example, defendant points to the questioning of Ken Robson, the boyfriend of defendant's mother. On direct examination Robson testified that defendant, upon learning of baby Amanda's death, had said that someone else was with him when Amanda got injured, muttering the names "Dennis" and "Terry." In cross-examining Robson, the prosecutor asked whether defense investigator Paul Ford had told Robson that it was "imperative" that the trial evidence "put somebody else in [defendant's] house when Amanda was injured."

Because defendant did not object and request that the trial court admonish the jury to disregard the prosecutor's questions, and because this was not a situation in which admonitions would have been futile, defendant may not now complain that the questions were prosecutorial misconduct. (*People* v. *Berryman, supra*, 6 Cal.4th at p. 1072; *People* v. *Price, supra*, 1 Cal.4th at p. 447.)

Moreover, defendant's claim lacks merit. A prosecutor's suggestion or insinuation that defense counsel fabricated the defense is misconduct only when there is "no evidence to support that claim." (*People* v. *Mitcham* (1992) 1 Cal.4th 1027, 1081-1082 [5 Cal.Rptr.2d 230, 824 P.2d 1277], italics omitted.) Here, there was evidence that members of the defense team may have suborned perjury. When Dennis Morgan was called as defense witness, he testified on cross-examination that defendant and the defense investigator had solicited him to give false testimony and that defense counsel offered him a bribe.

### 4. *Prosecutor's argument to jury that defendant and defense witnesses had lied*

Defendant contends that the prosecutor committed misconduct in arguing to the jury that "Mr. Earp lied about everything he said" and in characterizing defense witnesses as "liars" and their testimony as "lies." Defendant, however, did not object at the time to this argument, and he fails to establish that any harm in the comments could not have been cured by an admonishment to the jury. Therefore, the issue is not properly before us. (*People* v. *Berryman, supra*, 6 Cal.4th at p. 1072; *People* v. *Price, supra*, 1 Cal.4th at p. 447.)

Moreover, the prosecutor's argument was based on inferences that could reasonably be drawn from the evidence and therefore was proper. ▬

"The prosecutor is permitted to urge, in colorful terms, that defense witnesses are not entitled to credence [and] to argue on the basis of inference from the evidence that a defense is fabricated . . . ." (*People* v. *Pinholster* (1992) 1 Cal.4th 865, 948 [4 Cal.Rptr.2d 765, 824 P.2d 571]; accord, *People* v. *Edelbacher* (1989) 47 Cal.3d 983, 1030 [254 Cal.Rptr. 586, 766 P.2d 1] [no impropriety in arguing that the defendant was a " 'pathological liar,' and 'one of the greatest liars in the history of Fresno County' "].)

### 5. *Prosecutor's purported harassment of defense witnesses*

■ According to defendant, the prosecutor harassed defense witnesses. In one instance, the prosecutor recalled Cindy Doshier, baby Amanda's mother, to the witness stand to clarify a statement she had made, in response to a question by defense counsel, that the *prosecutor* had told her that semen was found in the course of a medical examination of baby Amanda that matched defendant's. Because the weight of the medical evidence showed that semen was *not* found in or on Amanda, Doshier's testimony implied that the prosecutor had somehow misled her about the state of the evidence. When recalled as a witness, however, Doshier testified that she had been mistaken and that it was her *ex-husband* who had told her the story about the semen. Defendant points to nothing in the record suggesting that improper tactics by the prosecutor prompted Doshier to recant her earlier testimony.

Defendant bases his claim of prosecutorial harassment of Virginia MacNair on a comment the prosecutor made outside the jury's presence in the courthouse hallway after both sides had rested in the guilt phase trial when he told MacNair: "You are foolish and you know it." When defense counsel heard of the incident, he reported it to the trial court, asserting it was "witness tampering." The trial court chided the prosecutor for making the comment, but concluded that because the prosecutor had not in any manner threatened MacNair, there was no harassment or witness tampering. (See *In re Martin* (1987) 44 Cal.3d 1, 30-31 [241 Cal.Rptr. 263, 744 P.2d 374] [prosecutorial misconduct to threaten defense witnesses when the threat interferes with the defendant's compulsory-process right].) Even if the comment could be construed as prosecutorial misconduct, defendant suffered no prejudice. The comment had no effect on the guilt phase of the trial, which had already been completed, and it did not deter MacNair from later testifying at the penalty phase as a defense witness.

Defendant also mentions a comment the prosecutor allegedly made at sidebar, but not heard by the trial court, calling one of the defense lawyers "sleaze" or "sleazy." Defendant fails to explain how this comment, even if heard by the jury, constituted prosecutorial harassment of defense witnesses.

### 6. *Other contentions of prosecutorial misconduct*

Defendant contends that in arguing to the jury, "there is no reasonable doubt in this case unless you believe [defendant] is telling the truth," the prosecutor suggested that a guilty verdict hinged on defendant's credibility and thus improperly shifted the burden of proof to the defense. We discern no impropriety in the prosecutor's argument. Viewed in context, it merely invited the jury to compare defendant's explanation of the evidence with the prosecution's while stressing to the jury that the prosecution had proven its case beyond a reasonable doubt.

Similarly without merit is defendant's claim that the prosecutor committed misconduct by expressing in argument to the jury his personal belief in defendant's guilt. The prosecutor started to say, "And I am convinced," but realizing he had misspoken, he quickly added "although my being convinced is irrelevant, [and defense counsel's] feeling about the evidence is irrelevant." The prosecutor then stressed the jury's duty to decide the case "based upon the evidence." Thus, the jury was not left with the impression that the prosecutor was convinced of defendant's guilt based on information known to him but not presented at trial. (See *People* v. *Sandoval* (1992) 4 Cal.4th 155, 183 [14 Cal.Rptr.2d 342, 841 P.2d 862] [noting that when a prosecutor expresses personal belief in the defendant's guilt the "jurors may assume there is other evidence at his command on which he bases this conclusion"].) There was no misconduct.

We also reject defendant's assertion that by arguing that defendant's testimony was not to be believed, the prosecutor was urging the jury to return a guilty verdict for special circumstance murder because defendant had committed perjury. Here, the prosecutor did not argue that defendant's lies warranted conviction, but rather that defendant had not told the truth. In this respect, this case differs from *People* v. *Ellis* (1966) 65 Cal.2d 529, 541, footnote 17 [55 Cal.Rptr. 385, 421 P.2d 393], in which we described as misconduct a prosecutor's statement to the jury that it could " 'do nothing else but find a perjurer guilty' " of the charged offense.

Nor is there merit to defendant's claim that here the prosecutor had an obligation during defense counsel's direct examination of prosecution investigator Detective Edwin Milkey to prevent Milkey from mentioning that he had investigated possible subornation of perjury. These are the relevant facts: During Milkey's November 6, 1991, testimony, defense counsel Louis Bernstein inquired about an interview Milkey had conducted of Dennis Morgan on October 7, 1991, during a recess in this trial. Bernstein's questioning focused on what Morgan had told Milkey about a telephone

conversation between defendant and Diane Ellison, baby Amanda's grand-mother, around the time of baby Amanda's death. This exchange followed:

Mr. Bernstein: "Now, did you as an investigator, did you try to determine when this call from [defendant] or to [defendant] occurred in relationship to August 25, 1988 [the day Amanda lost consciousness]?"

Detective Milkey: "Since October 7th? No, I have been chasing other things on some issues that have come up in this case concerning some people."

Mr. Bernstein: "So you haven't done that; is that right?"

Detective Milkey: "No, I haven't. I have been looking at other issues."

Mr. Bernstein: "How come?"

Detective Milkey: "If you want to know, I have been investigating subor-dination [*sic*] of perjury."

██ A prosecutor "has the duty to guard against statements by his witnesses containing inadmissible evidence," and if a prosecutor "believes a witness may give an inadmissible answer during his examination, he must warn the witness to refrain from making such a statement." (*People* v. *Warren, supra,* 45 Cal.3d 471, 481-482.) ██ Here, Detective Milkey stated that he was investigating subornation of perjury in response to a question asked him not by the prosecutor but by defense counsel who had called Milkey as his own witness. Assuming for the sake of argument that under *Warren* the prosecutor here had a duty to see to it that during defense counsel's questioning of the prosecutor's investigator called as a defense witness, the investigator would not mention an ongoing investigation into subornation of perjury, nothing in the record suggests that the prosecutor had a basis for anticipating the response in question by Detective Milkey. Therefore, there was no prosecutorial misconduct.

7. *Cumulative effect of asserted instances of prosecutorial misconduct*

Contrary to defendant's assertion, when considered together, the instances of alleged prosecutorial misconduct discussed above, which constituted only a fraction of the questions and comments during the lengthy trial on the issue of defendant's guilt, did not adversely affect the fundamental fairness of the trial.

C. *Alleged Withholding of Evidence by the Prosecution*

██ Defendant contends that the prosecution suppressed favorable, material evidence by failing to make available to the defense the following:

photographs purportedly taken of defendant's genitals; a tape recording of a conversation between baby Amanda's grandmother, Diane Ellison, and her son Jeff; and a sheriff's department report listing photographs taken on August 26, 1988, documenting the search of Virginia MacNair's house.

 "The prosecution has a duty under the Fourteenth Amendment's due process clause to disclose evidence to a criminal defendant" when the evidence is "both favorable to the defendant and material on either guilt or punishment." (*In re Sassounian* (1995) 9 Cal.4th 535, 543 [37 Cal.Rptr.2d 446, 887 P.2d 527], citing *United States* v. *Bagley* (1985) 473 U.S. 667, 674-678 [105 S.Ct. 3375, 3379-3382, 87 L.Ed.2d 481]; see also *Brady* v. *Maryland* (1963) 373 U.S. 83, 87 [83 S.Ct. 1194, 1196-1197, 10 L.Ed.2d 215].) Evidence is "favorable" if it hurts the prosecution or helps the defense. (*In re Sassounian, supra*, at p. 544.) "Evidence is 'material' 'only if there is a reasonable probability that, had [it] been disclosed to the defense, the result . . . would have been different.' " (*Ibid.*, quoting *United States* v. *Bagley, supra*, at p. 682 [105 S.Ct. at pp. 3383-3384]; accord, *Kyles* v. *Whitley* (1995) 514 U.S. 419, 433-434 [115 S.Ct. 1555, 1565-1566, 131 L.Ed.2d 490].) Defendant asserts that in a capital case, the Eighth Amendment's prohibition on cruel and unusual punishment is also violated by the prosecution's suppression of material evidence favorable to the defense. As we shall explain, we discern no infringement of constitutional rights in the three instances cited by defendant.

### 1. Withholding photographs of defendant's genitals

 Defendant contends that the prosecution wrongfully withheld from the defense certain photographs of defendant's genitals. The relevant facts are these: On August 31, 1988, the day defendant was arraigned and entered a not guilty plea, the prosecutor asked the trial court to order "that defendant's body be examined by the investigating officer and photographed if anything is revealed as a result of the examination." Deputy Public Defender Charles Klum, who represented defendant at the arraignment, objected to the request. He added, however, that "in the event the court does sign this, I would like the court to order that I would be allowed to be present at the time that the search is made or that the viewing is made." The prosecutor voiced no objection to such presence, and the trial court then granted the prosecution's request for a physical examination of defendant.

More than three years later, after the jury returned a death penalty verdict, defendant moved for a new trial (§ 1181), asserting for the first time that during the physical examination in August 1988, photographs were taken of his genitals but withheld from the defense. In a supporting declaration,

Deputy Public Defender Klum stated that, together with medical personnel and members of the defense team, he was present at the Antelope Valley Municipal Court's lockup facility "for both the physical examination and the taking of photographs," and that he heard comments by those conducting the physical examination that defendant's penis showed "no tearing or injuries." Defendant's own declaration stated that in the course of the August 31, 1988, physical examination, "photographs were taken of my genital area."

In opposing defendant's motion for a new trial, the prosecution presented a declaration by its investigator, Detective Edwin Milkey, that after a cursory examination of defendant's genitals he determined "there was nothing remarkable," and thus "no photographs were taken," either on August 31, 1988, or at any later time.

The trial court denied defendant's motion for a new trial. It ruled that photographs, if any, taken of defendant's genitals during the August 31, 1988, physical examination would not be material on the issue of defendant's guilt in light of the conclusion of those conducting the examination that there was no tearing or injury to defendant's penis. That conclusion was made in the presence of, and heard by, Deputy Public Defender Charles Klum.

The Attorney General points out that because the claimed photographs did not exist, there was nothing to turn over to the defense, noting that there is only defendant's self-serving declaration that the prosecution had such photographs. The Attorney General notes that although the declaration of Deputy Public Defender Klum mentions those who were present for "the taking of photographs," it does not state that Klum saw anyone take any photographs.

We need not resolve the factual dispute. We agree with the trial court that any photographs taken during the August 31, 1988, physical examination would not qualify under the relevant constitutional standard as material evidence. (*Kyles* v. *Whitley, supra,* 514 U.S. 419, 433-434 [115 S.Ct. 1555, 1565-1566]; *In re Sassounian, supra,* 9 Cal.4th 535, 543.) It is not reasonably probable (*Kyles* v. *Whitley, supra,* 514 U.S. 419, 433; *In re Sassounian, supra,* 9 Cal.4th 535, 544), given the evidence of defendant's personal culpability in this case, that the jury would have reached more favorable verdicts on guilt or on penalty had it known that photographs taken six days after the rape and sodomy of eighteen-month-old Amanda Doshier showed no tearing or bruising on defendant's penis.

### 2. *Prosecution's failure to disclose tape recording*

Also not material to either guilt or penalty was the tape recording of a conversation between baby Amanda's grandmother, Diane Ellison, and her

son Jeff that defendant claims was wrongfully withheld from the defense. Ellison and Dennis Morgan, who defendant claimed was responsible for baby Amanda's injuries, had lived together for a while after Morgan's release from Susanville Prison, but later had a falling-out.

During direct examination by the prosecutor, Ellison testified that she had assisted the defense investigators by providing them with Morgan's name and telephone number but had given no information about Morgan to the prosecution. Ellison denied she had ever done "some favors" for defense investigator Paul Ford. She acknowledged, however, that "in a fit of temper" she might have told her son Jeff that a defense investigator owed her a favor. After a brief recess in the trial, the prosecutor resumed questioning Ellison. Ellison said that a tape recording the prosecution had played during the recess jogged her memory about the conversation she had with Jeff. The prosecutor then asked, "Did you in fact make a statement to your son, Jeff, that you were going to call [defendant's] investigators or investigator because they owed you some favors?" Ellison replied, "In calming a hysterical child down yes, I did." At one point, the prosecutor asked Ellison if she wanted to hear the tape recording again, so "you can tell us what about the tape would make you feel [Jeff] was agitated." Defense counsel objected, asserting that the conversation between Ellison and Jeff had been recorded without their knowledge. The prosecutor responded that he was not asking to play the tape for the jury. Outside the jury's presence, the trial court commented that Ellison appeared hostile toward the prosecution and that therefore the prosecutor's line of questioning was highly probative of Ellison's credibility. This exchange followed:

The Court: "And of course, the tape will not be played in court, in open court, at this time unless the People ask that be done and after I hear it and determine if it is relevant. But I took that last question by [prosecutor] Mr. Foltz merely as an offer to refresh the witness's recollection outside the presence of the jury."

[Defense counsel] Ms. Dell: "The reason I misunderstood Mr. Foltz is I believe they played it for the witness about a half an hour ago out of the presence of the jury."

Mr. Foltz: "Excerpts, I believe she said."

[Defense counsel] Mr. Bernstein: "I would also indicate that under the Penal Code a tape recording that is not consensual is not admissible for any purpose, impeachment, refreshing recollection, it is illegally obtained unless there is some foundation that this was done by virtue of a court order, wire tap or anything of that sort."

The Court: "I don't want to sit here and argue the merits of Penal Code section 632. I am sure that's what you are referring to, Mr. Bernstein. But if you are going to make that objection, that hasn't been used yet, I will rule on it. Now, nowhere has it been offered into evidence."

The tape recording of the conversation in which Ellison told her son Jeff that a defense investigator owed her favors was not introduced into evidence and was not again mentioned until defendant's new trial motion listed it as evidence that the prosecution had improperly withheld from the defense.

Defendant now contends that the tape recording was material evidence favorable to the defense that the prosecution wrongfully withheld. We disagree.

We are not persuaded that the information on the tape recording was in any way favorable to the defense. Defendant asks that we follow *People* v. *Shipp* (1963) 59 Cal.2d 845, 850 [31 Cal.Rptr. 457, 382 P.2d 577], in which this court, in concluding that the defendant was not prejudiced by the prosecution's withholding of an investigator's report, did so based on an *assumption* that the unknown contents of the report would have assisted the defense. We see no reason to assume in this case that the contents of the tape recording would have benefited defendant. Here, defense counsel objected to having the jury hear the tape recording, and counsel did not mention the tape recording or its contents when cross-examining Ellison or later upon calling her as a defense witness. These actions by defense counsel strongly suggest that the tape recording of the conversation between Ellison and her son Jeff was not evidence favorable to the defense.

### 3. *Prosecution's nondisclosure of sheriff's bookkeeping report*

Likewise without merit is defendant's contention that his right to a fair trial was adversely affected by the prosecution's nondisclosure of a bookkeeping report documenting the taking of 60 photographs by sheriff's department personnel during the August 26, 1988, search of Virginia Mac-Nair's home. Of those 60 photographs, only 38 were printed; copies of these were given to the defense. Detective Milkey explained in court that "it is not uncommon for a certain number of photographs from any scene not to develop." Defendant asserts that the bookkeeping report listing 60 as the total number of photographs taken "could" have been relevant to confirm MacNair's testimony that sheriff's deputies had "mov[ed] things about the house" during the search and that therefore the photographs admitted at trial did not accurately depict the state of MacNair's house before the August 26 search. Whatever relevance the bookkeeping report showing the total number of photographs taken may have had in supporting MacNair's trial

testimony, the question whether MacNair's house was neat or untidy when investigators arrived was not material to the issues in this case. The prosecution had no duty to disclose immaterial evidence. (*In re Sassounian, supra,* 9 Cal.4th at p. 543.)

### 4. *Cumulative effect of purported nondisclosures*

We reject defendant's contention that the cumulative effect of the claimed nondisclosures by the prosecution deprived defendant of evidence that was either "material" or "favorable to the defendant." (*In re Sassounian, supra,* 9 Cal.4th at p. 543.) It is not reasonably probable that the result in this case would have been different if the defense had been given access to any or all of the items defendant claims the prosecution withheld from him. (*Kyles* v. *Whitley, supra,* 514 U.S. 419, 433-434 [115 S.Ct. 1555, 1565-1566].)

### D. *Adequacy of Defense Counsel's Representation*

■■■ Defendant contends that his appointed trial attorneys failed to provide him with the effective assistance to which he is entitled under the Sixth Amendment of the federal Constitution and article I, section 15 of the California Constitution. ■■■ To establish a violation of the constitutional right to effective assistance of counsel, a defendant must not only "identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment," but he or she must also show that counsel's deficient performance "so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." (*Strickland* v. *Washington* (1984) 466 U.S. 668, 686, 690 [104 S.Ct. 2052, 2066-2064, 80 L.Ed.2d 674]; see also *People* v. *Kipp* (1998) 18 Cal.4th 349, 366 [75 Cal.Rptr.2d 716, 956 P.2d 1169].) As the United States Supreme Court has stressed: " '[T]he right to the effective assistance of counsel is not recognized for its own sake, but because of the effect it has on the ability of the accused to receive a fair trial. Absent some effect of challenged conduct on the reliability of the trial process, the Sixth Amendment guarantee is generally not implicated.' " (*Lockhart* v. *Fretwell* (1993) 506 U.S. 364, 369 [113 S.Ct. 838, 842, 122 L.Ed.2d 180], quoting *United States* v. *Cronic* (1984) 466 U.S. 648, 653 [104 S.Ct. 2039, 2043, 80 L.Ed.2d 657].)

A reviewing court may reject a claim of ineffective assistance of counsel without deciding whether counsel's performance was deficient if the defendant fails to show that the challenged actions by counsel affected the reliability of the trial process. (*Strickland* v. *Washington, supra,* 466 U.S. at p. 697 [104 S.Ct. at pp. 2069-2070]; *People* v. *Kipp, supra,* 18 Cal.4th at p. 366.)

Moreover, when "the record contains no explanation for the challenged behavior, an appellate court will reject the claim of ineffective assistance 'unless counsel was asked for an explanation and failed to provide one, or unless there simply could be no satisfactory explanation.' " (*People* v. *Kipp, supra,* at p. 367, quoting *People* v. *Pope* (1979) 23 Cal.3d 412, 426 [152 Cal.Rptr. 732, 590 P.2d 859, 2 A.L.R.4th 1].) Applying these standards, we reject each of defendant's contentions of ineffective assistance of counsel.

 1. *Defense counsel's eliciting testimony about semen in baby Amanda's mouth*

 Dr. Frederick Thysell, an emergency room physician at Palmdale Hospital, testified in the prosecution's case-in-chief regarding various tests and procedures performed on baby Amanda. On cross-examination, defense counsel Adrienne Dell asked Dr. Thysell whether a particular report indicated "there was no semen found." Thysell answered by explaining that the report in question, a urinalysis, mentioned "that there was no sperm, semen in the urine," but it was a "routine report" that "does not address the issue of our taking samples of the vagina and the rectum." Defense counsel then asked whether Thysell had ever obtained any contrary results, and he answered, "I did not." This exchange followed:

Ms. Dell: "Were you ever told that there was no semen found?"

Dr. Thysell: "I never was."

Ms. Dell: "Never checked into it?"

Dr. Thysell: "We did check the following day to find out what had happened. That was not what I was told."

Ms. Dell: "What were you told?"

Dr. Thysell: "I was told there was semen found. It was recovered out of the child's mouth."

 Defendant argues that a reasonably competent attorney would not have elicited this testimony, which defendant characterizes as prejudicial because it put before the jury the only evidence "that Amanda had actually been subjected to some form of penile intrusion by her attacker." We disagree.

 Immediately after Dr. Thysell's statement that he was told that semen had been found in baby Amanda's mouth, defense counsel quickly established,

through Dr. Thysell's testimony, that Thysell had no recollection of when or where he might have received that information and that he had made no notation in Amanda's file to indicate the recovery of semen.

In addition, other evidence adduced at trial called into question the accuracy of Dr. Thysell's testimony that he had been told about "semen found" in the child's mouth. Dr. Joel Ament, a resident at Kaiser Sunset Hospital to which Amanda was transferred, could not recall finding any semen during his treatment of Amanda. And he had no recollection of hearing of such recovery at an earlier time. When defense counsel asked whether Dr. Ament *might* have told doctors at Palmdale Hospital that Kaiser doctors found semen in Amanda's mouth, he replied, "anything is possible." He added that Amanda's hospital records did not indicate the presence of semen, that the practice was to include critical facts in the record, and "if semen was found in her oral cavity, that would have been an important fact for the record."

Similarly, pediatrician Dr. Richard Fefferman of Kaiser Sunset Hospital testified that Amanda's records did not indicate the presence of semen and that he was unaware of anyone at Kaiser telling Palmdale Hospital doctors of having found semen.

And Douglas Ridolfi, a criminalist with the Los Angeles County Sheriff's Department who had examined two sets of vaginal, rectal, and oral samples taken from Amanda, did not detect any semen, sperm, or seminal fluid in any of those samples.

Thus, the evidence taken as a whole would not have left the jury with the impression, that, as Dr. Thysell vaguely remembered, semen was found in baby Amanda's mouth.

Moreover, defendant is wrong that Dr. Thysell's testimony in question was the only evidence of "penile intrusion by her attacker." The autopsy by Dr. Eva Hauser of the Los Angeles County Coroner's Office revealed injuries inside Amanda's body between the vaginal and rectal areas that were consistent with blunt force trauma by a human penis either inside the rectum or inside the vagina. Furthermore, the primary theory of the defense was not that Amanda had not been sexually assaulted, but rather that Dennis Morgan was the one responsible for the sexual assault and death of Amanda. Accordingly, we conclude that Dr. Thysell's response to a question by defense counsel that someone had told him that semen had been "recovered out of the child's mouth" did not affect the reliability of the jury's guilt or penalty verdicts in this case. (*Strickland* v. *Washington, supra,* 466 U.S. 668,

686 [104 S.Ct. 2052, 2063-2064]; *People* v. *Kipp, supra,* 18 Cal.4th 349, 366.)

### 2. *Defense counsel's decision to call Dennis Morgan as a witness*

After the defense had subpoenaed Dennis Morgan, the prosecution's investigator, Detective Milkey, interviewed him, tape-recorded the interview, and made the recording available to the defense. Thus, before Morgan testified at trial, the defense knew that Morgan had told the prosecution that (1) defendant had previously been arrested for child molestation, and (2) defense counsel Bernstein had tried to bribe Morgan to commit perjury. Defense counsel called Morgan as a defense witness; Morgan repeated these accusations before the jury. According to defendant, no reasonably competent attorney acting as a diligent advocate would have subpoenaed Dennis Morgan, or having done so, would have made him a defense witness after learning that Morgan could be expected to make inflammatory accusations about the defense. We disagree.

The prosecution's evidence put defendant alone with 18-month-old Amanda on the day that she was sexually molested and suffered fatal injuries inflicted by severe shaking and blunt force trauma to the head. Defendant countered this evidence by testimony that Dennis Morgan, an ex-convict and drug addict with an unconventional sexual history, came to MacNair's house on the day of the incident in search of heroin. According to defendant, Morgan had the opportunity to commit the crimes when he was in the house alone with baby Amanda for about half an hour while defendant was outside washing paintbrushes. Morgan, called to testify by the defense, admitted being a heroin addict, described himself as a bisexual who in prison had dressed as a woman, and admitted that in the course of his criminal history he had used some 19 different aliases. Thus, as the Attorney General observes here, by putting Morgan on the witness stand the defense was able to present the jury with a "live, alternative suspect" who had a "complex and problematic sexual identity" and who plausibly could have been present at MacNair's house to have raped, sodomized, and shaken to death baby Amanda while defendant was outside washing his paintbrushes. We therefore cannot say that " 'there simply could be no satisfactory explanation' " (*People* v. *Kipp, supra,* 18 Cal.4th at p. 367) for defense counsel's decision to call Morgan as a witness, even though they could expect him to accuse defendant, as he had in the interview taped by Detective Milkey, of having previously been arrested for child molestation and to claim that defense attorney Bernstein had tried to bribe him to give false testimony.

Moreover, Morgan's testimony, taken as a whole, was far more beneficial than harmful to the defense. The trial court blunted any potential negative

impact of Morgan's statement that defendant had previously been arrested for child molestation, by instructing the jury that "there has been no other arrests for any other molestation" and "to disregard anything you have heard to the contrary; it hasn't happened." And Morgan's claim of bribery by defense attorney Bernstein was inherently unbelievable. According to Morgan, Bernstein came to see him in the Los Angeles County jail, and when Morgan entered the attorney visitor room, Bernstein was already there and a $20 bill was on the table. Thus, the implication was that Bernstein put the money on the table as a bribe for Morgan. Yet Morgan also testified that other inmates and attorneys and a deputy sheriff were present in the room. Thus, to accept as true that Bernstein had offered Morgan a $20 bribe, the jury would have to conclude that he had done so in the full view of others, including jail personnel. This scenario would have seemed all the more unlikely in light of testimony by Deputy Sheriff Joseph Koch that under Los Angeles County jail regulations, attorneys are permitted to give jail inmates no more than $5 in cash and then only after obtaining approval from jail personnel.

For the reasons given above, we cannot conclude that defense counsel's decision to call Morgan as a witness "so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." (*Strickland* v. *Washington, supra,* 466 U.S. 668, 686 [104 S.Ct. 2052, 2064].)

We also reject defendant's related contention that he was prejudiced by defense counsel's failure to make a timely request to play a redacted version of the tape recording of Detective Milkey's interview of Dennis Morgan. Defendant argues that the tape, if heard by the jury, would have impeached Morgan's trial testimony that he had entered the attorney visitor room to meet with defense attorney Bernstein and found a $20 bill on the table. In the taped interview Morgan said that Bernstein had offered the money "under the table." Even assuming, as defendant contends, that these two versions of the $20 bill incident are contradictory, defendant suffered no prejudice from defense counsel's failure to make a timely request to play the tape for the jury. As we have explained, Morgan's trial testimony about defense attorney Bernstein's offering him a $20 bribe in the full view of jail personnel was inherently unbelievable.

3. *Defense counsel's failure to mention Morgan in opening statement*

Defendant faults defense attorney Bernstein for not mentioning Dennis Morgan in his opening statement, which described how defendant found baby Amanda unconscious at the foot of the stairs. That failure, defendant

asserts, enabled the prosecutor in closing argument to argue that the "Dennis Morgan did it" defense was concocted only after defendant had a chance encounter with Morgan in jail after the start of the trial. We reject this contention.

Defense counsel's opening statement did not tie the defense to any particular theory; it simply told the jury in general terms that the evidence would show defendant to be "innocent of each and every allegation in this case." Defendant has not met his burden of demonstrating that there " 'could be no satisfactory explanation' " for counsel's conduct. (*People* v. *Kipp*, *supra*, 18 Cal.4th at p. 367.)

### 4. *Defense counsel's failure to offer evidence that there were no injuries to defendant's penis*

As discussed earlier, on August 31, 1988, personnel of the district attorney's office and the sheriff's department, including Detective Milkey, acting under a court order and in the presence of defendant's original appointed counsel, Charles Klum, examined defendant's penis but found no tearing or bruising. Defendant now contends that consistent with obligations of effective representation, trial counsel should have called Detective Milkey, Deputy Public Defender Klum, or others who could have testified that defendant's penis "showed none of the marks that would have been there if he had attempted to commit rape or sodomy on Amanda."

Defendant's contention rests on an assumption, unsupported by the record, that the person responsible for the sexual assault of 18-month-old Amanda would necessarily have manifested bruising and tearing on his penis 6 days later. As with the preceding contention, defendant has failed to show that there " 'could be no satisfactory explanation' " for the omission in question by defense counsel. (*People* v. *Kipp*, *supra*, 18 Cal.4th at p. 367.)

### 5. *Defense counsel's failure to object to prosecutor's questions and comments*

Referring to his allegations of prosecutorial misconduct, which we discussed in part III.B., *ante*, at pages 858-859, for which there was no defense objection at trial, defendant asserts that trial counsel was incompetent for not objecting in those instances. We disagree. Earlier we rejected on the merits these claims of prosecutorial misconduct and concluded that, considered together, the prosecutor's questions and comments at issue did not adversely affect the fundamental fairness of his trial.

### E. *Trial Court's Inquiry Into Defendant's Complaint About His Counsel*

On April 26, 1991, the trial court held a hearing to consider defendant's complaint that he had asked lead counsel Louis Bernstein to

investigate "something," but that Bernstein had "made himself unavailable." Defendant also told the court: "I need to spend a lot of time with my counsel on this type of case, and some of the things that has [*sic*] been done with my witnesses, real important witnesses, one witness is more important than the other ten witnesses in this case. I think [Bernstein] recklessly blew my chance of using that witness . . . ."[4] Attorney Bernstein explained that defendant simply disagreed with counsel's tactical decisions. He noted that "for the first year of representing Mr. Earp, Mr. Earp told a particular story," suggesting that defendant's disagreement with counsel's decisions stemmed from a recent change in defendant's version of events. Bernstein added that he had met with defendant eight to ten times and had discussed the case with him "via phone on numerous occasions." The trial court found "no reason" to relieve attorney Bernstein as defendant's counsel.

Citing *People* v. *Marsden* (1970) 2 Cal.3d 118 [84 Cal.Rptr. 156, 465 P.2d 44], defendant claims that the trial court at that hearing "failed to make adequate inquiry into these problems." We reject this contention.

In *Marsden*, we said: "[A] judge who denies a motion for substitution of attorneys solely on the basis of his courtroom observations, despite a defendant's offer to relate specific instances of misconduct, abuses the exercise of his discretion to determine the competency of the attorney. A judicial decision made without giving a party an opportunity to present argument or evidence in support of his contention 'is lacking in all the attributes of a judicial determination.' (*Spector* v. *Superior Court* (1961) 55 Cal.2d 839, 843 [13 Cal.Rptr. 189, 361 P.2d 909].)" (*People* v. *Marsden*, *supra*, 2 Cal.3d at p. 124.)

A defendant is entitled to have appointed counsel discharged upon a showing that counsel " ' "is not providing adequate representation" ' " or that counsel and defendant " ' "have become embroiled in such an irreconcilable conflict that ineffective representation is likely to result." ' " (*People* v. *Memro* (1995) 11 Cal.4th 786, 857 [47 Cal.Rptr.2d 219, 905 P.2d 1305].) We review a trial court's decision declining to relieve appointed counsel under the deferential abuse of discretion standard. (*People* v. *Berryman*, *supra*, 6 Cal.4th 1048, 1070.) We discern no such abuse here.

Defendant apparently disagreed with Bernstein's tactical decisions, but the record of the hearing on defendant's request to relieve counsel fails to reveal that the disagreement was irreconcilable or likely to result in ineffective representation. We therefore reject defendant's contention that

---

[4]Defendant stated that he had no complaint about defense attorney Marcia Morrissey, who at the time of the hearing was second counsel.

the trial court here abused its discretion in conducting the inquiry into defendant's complaint about defense attorney Bernstein that preceded the court's decision not to remove Bernstein as counsel.[5]

## F. Admission and Exclusion of Evidence

 Defendant contends that in admitting and excluding proffered evidence at trial, the trial court committed errors that individually and cumulatively deprived him of due process and a fair trial in violation of the Fifth, Eighth, and Fourteenth Amendments to the federal Constitution as well as unspecified provisions of California law. We disagree.

### 1. Admission of Morgan's testimony about the $20 bribe

As discussed earlier, the defense called Dennis Morgan as a witness at trial. Before Morgan took the stand, defense attorney Adrienne Dell sought to exclude any testimony by Morgan that defense attorney Bernstein had tried to bribe him with $20. Dell informed the court that "Morgan would testify, at least according to his taped statement, that he was served with a subpoena by Mr. Bernstein [and] at the same time, he was passed under the table a 20-dollar bill." Dell added that both she and defendant had been present at the jail visit with Morgan, that "no money was ever passed," and that "it is physically impossible to pass money under the table at the county jail facility." Dell argued that allowing Morgan to give such testimony "goes to the very heart of the credibility of defense counsel in this case." In support, she cited Evidence Code section 352.[6]

In refusing to exclude Morgan's testimony about the $20 bill, the trial court noted that Morgan's testimony could "be easily refuted by any member of the jail staff and would go to the credibility of the witness." The court added: "An attorney, regardless of which side of the table he sits on, cannot pick and choose the testimony a witness is going to give if he chooses to call

---

[5]When considering his contention that the trial court failed to make adequate inquiry into the complaint about defense counsel Bernstein, defendant asks that we take into account information from the following sources developed later in the trial: testimony by the defense investigators and the comments at a September 10, 1991, in camera hearing of Attorney Adrienne Dell, who replaced Attorney Morrissey as second counsel. Defendant contends this information demonstrates a substantial basis for his concerns about Bernstein. Because we limit our review of a motion to relieve counsel to matters developed in the course of the hearing on the motion (*People* v. *Berryman*, *supra*, 6 Cal.4th at p. 1070), we decline to consider these later developments.

[6]Evidence Code section 352 provides: "The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury."

this witness. . . . You will take what this witness has to say completely. If he is a liar, he is a liar." Thereafter, Morgan testified on cross-examination that when defense counsel Bernstein came to see him in the Los Angeles County jail and Morgan entered the attorney-visitor room, there was a $20 bill on the table and Morgan "assumed" Bernstein had put it there.

We do not decide whether, as defendant contends, this testimony by Morgan was far more prejudicial than probative and thus should have been excluded under Evidence Code section 352. We do not reverse a judgment for erroneous admission of evidence unless "the admitted evidence should have been excluded on the ground stated and . . . the error or errors complained of resulted in a miscarriage of justice." (Evid. Code, § 353, subd. (b); see also *People* v. *Rodrigues* (1994) 8 Cal.4th 1060, 1124 [36 Cal.Rptr.2d 235, 885 P.2d 1]; *People* v. *Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243] [error is harmless under our state constitutional standard unless it is "reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error"].)

Here, there was no miscarriage of justice. As explained in part III.D.2., *ante*, page 874, where we concluded that defense counsel were not ineffective in calling Morgan as a witness, Morgan's story was inherently unbelievable. For the jury to accept the story as true, it would have to conclude that defense counsel Bernstein had placed the $20 bill on the table in violation of jail regulations and in full view not only of the deputy sheriff guarding the attorney-visitor room but also of other inmates and attorneys. Moreover, the evidence that defendant sexually assaulted and brutally murdered a helpless infant left in his care was substantial if not overwhelming. In light of this evidence, it is not reasonably probable that the jury would have reached a different verdict had it never heard Morgan's testimony about the $20 bill.

Defendant also contends that admission of Morgan's testimony violated various federal and state constitutional provisions. Because defendant did not object to admission of the evidence on those grounds at trial, he has not preserved the claims for review. (*People* v. *Ramos* (1997) 15 Cal.4th 1133, 1170 [64 Cal.Rptr.2d 892, 938 P.2d 950].)

2. *Trial court's refusal to allow Attorney Bernstein to testify*

When the trial court allowed Morgan to testify about the $20 bill, it also ruled that defense attorney Bernstein could not refute the evidence through his own testimony. The judge explained: "I [will] not allow any attorney to argue his or her own credibility."

After Morgan's testimony on cross-examination about the $20 bill, defense attorney Dell sought to call Bernstein as a witness, arguing this was the only way to refute Morgan's testimony in question. The trial court disagreed, noting that the defense could refute Morgan's claim by calling as a witness the on-duty watch commander who was present when Bernstein came to see Morgan in the visitor room and presumably would have noticed Bernstein's placement of money, if any, on the table. The trial court reaffirmed its earlier ruling that defense attorney Bernstein could not testify. This ruling, defendant claims, precluded him from presenting evidence that would refute damaging testimony by Morgan.

Preliminarily, we note that the trial court was wrong in its assumption that attorneys, categorically, cannot testify in any criminal case in which they act as counsel. As we said in *People* v. *Marquez* (1992) 1 Cal.4th 553, 574 [3 Cal.Rptr.2d 710, 822 P.2d 418], "a trial court may not deny the defendant the right to present impeaching evidence through the testimony of his counsel, notwithstanding the provisions relating to testimony by counsel in the Rules of Professional Conduct." Assuming for the sake of argument that the trial court should have permitted defense attorney Bernstein to testify in this case to refute Morgan's story about the $20 bill, the error was harmless. As already explained, Morgan's testimony was refuted by other evidence.

### 3. *Excluding redacted version of tape recording of Dennis Morgan's interview*

When called as a defense witness, Dennis Morgan testified regarding statements he had made to prosecution investigator Detective Edwin Milkey in a tape-recorded interview. Thereafter, the defense called Detective Milkey and questioned him about the interview. Defense counsel asked Milkey if he had reviewed a transcription of the tape recording that had been prepared by the defense. Milkey answered: "I have looked at one and a quarter pages of what's purported to be on the tape. But what's on the transcript is not what's on the tape." During a recess in the trial, defense attorney Bernstein told the court that the transcription was nothing more than a "working copy" that a secretary had prepared after listening to the tape. This "working copy," Bernstein said, was never meant to be a "word for word accurate" transcription but was "just a guide to go along with the tape." That night, Detective Milkey listened to the tape recording to refresh his recollection of Morgan's comments in the interview. The next day when Milkey returned to the witness stand, defense counsel again asked him about the interview of Morgan; counsel used the defense "working copy" as the basis for the questioning. In responding to a question, Detective Milkey remarked that the "working copy" transcript of the tape recording of the Morgan interview

"wasn't complete as to what was said." Milkey added that the previous evening he had "made corrections" to the "working copy," and in response to another question he said that "the way it is written on the transcript is in error."

On cross-examination, the prosecutor asked Detective Milkey if the "working copy" transcript prepared by the defense accurately reflected what was on the tape recording of the interview. The defense immediately objected that the answer would be "irrelevant and immaterial." The trial court overruled the objection. Milkey then answered: "No, it is not." When the prosecution asked if the transcript was "different from the tape in more than one way," Milkey replied: "Yes, in over 400 ways."

To refute Milkey's comment, defendant sought to have a "redacted" version of the tape recording played for the jury. The prosecution objected to the playing of a "redacted" tape, but it had no objection to playing the tape recording in its entirety. The court found that the tape recording of the Morgan interview was irrelevant to any issue in the case but said that it would allow the jury to listen to the entire tape if the parties so stipulated. When the defense refused to do so, the court stated: "Absent stipulation, the tape will not be played."

Defendant challenges the trial court's ruling as a violation of his "right" under Evidence Code section 780, subdivision (i) to prove the "nonexistence of any fact testified to" by a witness. Preliminarily we observe that contrary to defendant's assertion, that provision does not grant litigants an unbridled "right" to prove the nonexistence of any fact a witness has testified to. Rather, it provides that "the court or the jury may consider in determining the credibility of a witness any matter that has any tendency in reason to prove or disprove the truthfulness of his testimony at the hearing," and it specifies in several subdivisions categories of evidence that might be relevant for this purpose including, in subdivision (i), "[t]he existence or nonexistence of any fact testified to" by the witness.

Even assuming that the trial court erred in not allowing a redacted version of Morgan's tape-recorded interview to be played for the jury, reversal of a judgment or decision "by reason of the erroneous exclusion of evidence" is proper only when there has been a miscarriage of justice. (Evid. Code, § 354.) That is not the case here. It is not reasonably probable that upon hearing evidence of the "nonexistent fact" defendant sought to establish (i.e., that Detective Milkey was exaggerating when he said the defense "working copy" transcription contained 400 errors), the jury would have reached a result more favorable to defendant. (*People* v. *Watson, supra,* 46 Cal.2d 818, 836.)

Defendant also claims the exclusion violated his "Sixth Amendment right to confront an adverse witness (Morgan as well as Milkey)" and "Fifth and Fourteenth Amendment rights to present evidence in his own behalf." As in *People* v. *Barnett* (1998) 17 Cal.4th 1044, 1182 [74 Cal.Rptr.2d 121, 954 P.2d 384], defendant fails "to support that claim with adequate argument." We therefore reject it as not properly raised. (*Ibid.*; *People* v. *Gordon, supra,* 50 Cal.3d 1223, 1244, fn. 3; *People* v. *Bonin* (1989) 47 Cal.3d 808, 857, fn. 6 [254 Cal.Rptr. 298, 765 P.2d 460].)

### 4. *Admission of photographs and slides of baby Amanda's injuries*

■ Over a defense objection on the ground that the evidence was more prejudicial than probative (Evid. Code, § 352), the trial court admitted two photographs taken during the autopsy of baby Amanda that depicted her anal area and buttocks. Defendant argues that the trial court abused its discretion in admitting these two photographs, asserting that they were cumulative of two others taken before Amanda's death, and that they gave an exaggerated and misleading impression because bruises visible on one post mortem photograph appeared darker than those shown on one taken before Amanda's death. We discern no abuse of discretion.

As testified by Dr. Eva Hauser, the deputy medical examiner, one of the autopsy photographs showed Amanda's anal opening to be "wide open" and "stretched out" rather than "puckered." This, Dr. Hauser said, differed from a "normal anus," which would have a "constricted, puckered appearance." The second autopsy photograph depicted bruising on Amanda's buttocks. These two photographs taken during the autopsy did not duplicate the two taken before Amanda died, one depicting Amanda's vagina and the other taken with Amanda on her side and showing the top of one buttock. Although in the coroner's photograph the bruises on Amanda's buttocks appear somewhat darker than the bruises shown on the photograph taken while Amanda was still alive, the coroner's photograph also shows considerably more detail than the one taken before she died. The trial court did not abuse its broad discretion in admitting the two coroner's photographs. (*People* v. *Ramos, supra,* 15 Cal.4th 1133, 1170; *People* v. *Carpenter* (1997) 15 Cal.4th 312, 385 [63 Cal.Rptr.2d 1, 935 P.2d 708].)

Likewise, the trial court acted well within its discretion in allowing the jury to view three slides depicting the injuries to Amanda's anus and vagina. We agree with the trial court's observation that the slides, projected larger than life, were "somewhat clinical" but "extremely illustrative" in aid of the testimony by Kaiser Sunset Hospital doctor Joel Ament, who described Amanda's injuries.

Finally, defendant argues that admission of the two coroner's photographs and the three slides violated the federal Constitution's Eighth and Fourteenth Amendments. Because defendant did not object to admission of the evidence on these grounds at trial, he has not preserved these claims. (*People* v. *Ramos*, *supra*, 15 Cal.4th at p. 1170.)

 5. *Trial court's refusal to order Dennis Morgan to undergo a blood test*

 Near the close of the defense case, defense counsel reminded the trial court of Dennis Morgan's testimony that a medical examination in jail had evaluated him to be HIV-negative. From this testimony, defense counsel presumed that the jail had a sample of Morgan's blood that could be tested for blood type. Counsel mentioned that he had subpoenaed Morgan's jail medical records, but also asked the court to order the jail medical division to determine Morgan's blood type. The trial court stated that it would issue the order *if* the jail had a sample of Morgan's blood available for "typing" or *if* Morgan consented to have blood drawn. The trial court refused to order that blood be taken from Morgan against his will, citing *People* v. *Melton* (1988) 44 Cal.3d 713, 738 [244 Cal.Rptr. 867, 750 P.2d 741]. In *Melton*, we held that "[a] defendant's constitutional right to confront a witness does not entitle him to obtain court-ordered evidence in violation of the witness's constitutional rights against unreasonable searches and seizures." (*Ibid.*)

Defendant contends that the trial court erred in refusing to order that blood be drawn from Dennis Morgan for use in a blood test. He argues that his own testimony that Morgan was present at the time Amanda suffered her fatal injuries provided the court with probable cause to order Morgan to give a blood sample. Because defendant did not make this argument in the trial court, he may not now raise the issue. "It is both unfair and inefficient to permit a claim of error on appeal that, if timely brought to the attention of the trial court, could have been easily corrected or avoided." (*People* v. *Vera* (1997) 15 Cal.4th 269, 276 [62 Cal.Rptr.2d 754, 934 P.2d 1279]; see also *People* v. *Hines* (1997) 15 Cal.4th 997, 1035 [64 Cal.Rptr.2d 594, 938 P.2d 388] [claim that ruling violated constitutional right was not preserved for appeal because of failure to object on that ground at trial].)

 Even if properly before us, the claim lacks merit. Before a court can order an "instrusion[] beneath the body's surface," it must find the existence of "probable cause" to believe the intrusion will uncover material evidence, and it must then weigh "the degree of intrusion against the likelihood and importance of recovering the evidence." (*People* v. *Melton*, *supra*, 44 Cal.3d 713, 738; *People* v. *Scott* (1978) 21 Cal.3d 284, 293 [145

Cal.Rptr. 876, 578 P.2d 123].) We evaluate the existence of probable cause by considering the totality of circumstances. (See *People* v. *Camarella* (1991) 54 Cal.3d 592, 600-601 [286 Cal.Rptr. 780, 818 P.2d 63] [setting out the "totality of circumstances" considered in evaluating probable cause supporting a search warrant].) Here, the totality of circumstances fails to establish probable cause to believe that testing Morgan's blood would uncover material evidence.

The blood type evidence in this case, as testified to during the defense case by sheriff's department criminalist Douglas Ridolfi, was that the blood-stains recovered at the crime scene were consistent with the blood of about half of the general population. Thus testing of Morgan's blood, at most, could have established that he did or did not fall within that half. The possibility of uncovering such inconclusive evidence provided insufficient cause for the trial court to order Morgan to submit to a blood test.

6. *Permitting the prosecutor's redirect examination of Virginia MacNair about telephone conversations*

Defendant contends the trial court erred in overruling his objection to "a line of questions" the prosecutor asked defendant's girlfriend, Virginia MacNair, on redirect examination about telephone conversations she had with defendant. These are the relevant facts:

On direct examination by the prosecutor, Virginia MacNair testified that on August 25, 1988, the day baby Amanda was rushed to the hospital, defendant had telephoned MacNair at home around 6:00 or 6:30 in the evening and asked about Amanda's condition. MacNair told defendant that deputy sheriffs had said that Amanda had been sexually molested. On cross-examination, when asked by defense counsel if she had ever spoken to defendant since August 25, 1988, when she left for work at 7:00 a.m., MacNair said that she had "gotten calls from him." Also in response to defense questioning, MacNair denied that she had "ever discussed" with defendant whether "he should run away." On redirect examination, the prosecution asked MacNair if in a telephone conversation during the evening hours of Thursday, August 25, 1988, she had told defendant "anything at all about the nature of Amanda's injuries."

When defense counsel objected to this question by the prosecutor as beyond the scope of cross-examination, the trial court overruled the objection. The court stated: "When there is evidence of conversations on the telephone, the People are not limited to just those conversations." The court relied on *People* v. *Phillips* (1985) 41 Cal.3d 29, 56 [222 Cal.Rptr. 127, 711

P.2d 423], which holds that the scope of cross-examination can exceed the scope of direct examination when a defendant takes the witness stand and makes a "general denial" of committing the crime charged. Defendant argues there "was no legal basis" for the trial court's ruling. We disagree. The situation here, in which defendant's girlfriend on cross-examination made a "general denial" that she and defendant had "ever discussed" his fleeing the authorities, was sufficiently similar to the situation in *People* v. *Phillips*, in which the defendant made a general denial of the crime, that the trial court here did not abuse its discretion in allowing the prosecutor, in redirect examination, to question MacNair on this point with regard to the August 25, 1988, telephone conversation.

Defendant also makes the sweeping assertion that the trial court's ruling "rendered the trial fundamentally unfair" and denied him "the heightened due process to which he had a right under the Eighth Amendment." Because defendant did not object at trial on these grounds, he is barred from raising these issues on appeal. (*People* v. *Hines, supra,* 15 Cal.4th 997, 1035.)

### 7. *Miscellaneous claims of trial court error*

Defendant contends the trial court erred in allowing the prosecutor to pursue a number of irrelevant and collateral matters, to ask numerous argumentative questions, and to introduce a recently made video of the neighborhood where defendant's girlfriend, Virginia MacNair, lived. He also complains he was subjected to unequal treatment when the trial court sustained the prosecutor's objection to a defense question while overruling a defense objection to a somewhat similar prosecution question.

Other than broad references to "fundamental fairness" and "heightened due process," defendant provides no legal authority, reasoning, or analysis to explain why any of these rulings was in error. Defendant did not object on any constitutional ground to these trial court rulings. Thus, his assertions that the rulings violated "fundamental fairness" or "heightened due process" are not preserved for appeal. (*People* v. *Hines, supra,* 15 Cal.4th 997, 1035.) Moreover, as noted earlier, we need not consider on appeal mere contentions of error unaccompanied by legal argument. (*People* v. *Barnett, supra,* 17 Cal.4th 1044, 1182; *People* v. *Gordon, supra,* 50 Cal.3d 1223, 1244, fn. 3; *People* v. *Bonin, supra,* 47 Cal.3d 808, 857, fn. 6.)

### G. *Jury Instructions*

#### 1. *Trial court's failure to instruct on lesser included offenses*

The trial court instructed the jury on two theories of first degree murder: premeditated and deliberate murder and felony murder. The court

also instructed on the "express malice" form of second degree murder. But it refused defendant's request to instruct on the "implied malice" form of second degree murder.[7] In addition, the trial court refused defendant's request for instructions on involuntary manslaughter. Defendant contends that the failure to instruct on the implied malice form of second degree murder and on involuntary manslaughter was prejudicial error requiring reversal. We disagree. Because the jury in returning its "true" finding on the special-circumstance allegations that defendant killed baby Amanda while perpetrating the felony offenses of rape and lewd conduct with a child under age 14 (§ 190.2, former subd. (a)(17)(iii) and (v)) necessarily determined that the killing was first degree murder, any error in failing to instruct on these lesser included offenses was harmless.

 In a criminal case, a trial court must instruct on the general principles of law relevant to the issues raised by the evidence. (*People* v. *Breverman* (1998) 19 Cal.4th 142, 154 [77 Cal.Rptr.2d 870, 960 P.2d 1094].) Therefore, even without a request, the court must instruct on lesser included offenses when the evidence raises a question as to whether all of the elements of the charged offense were present. (*Ibid.*)

 "[S]econd degree murder with implied malice has been committed 'when a person does an act, the natural consequences of which are dangerous to life, which act was deliberately performed by a person who knows that his conduct endangers the life of another and who acts with conscious disregard for life.' " (*People* v. *Nieto Benitez* (1992) 4 Cal.4th 91, 104 [13 Cal.Rptr.2d 864, 840 P.2d 969]; see § 189 [defining murder].) "Involuntary manslaughter is a killing committed 'in the commission of an unlawful act, not amounting to a felony; or in the commission of a lawful act which might produce death, in an unlawful manner, or without due caution and circumspection.' " (*People* v. *Prettyman* (1996) 14 Cal.4th 248, 274 [58 Cal.Rptr.2d 827, 926 P.2d 1013], quoting § 192, subd. (b) [defining involuntary manslaughter].) In support of his argument that the trial court

---

[7]In instructing on second degree murder, the trial court gave a modified version of CALJIC No. 8.11 defining "malice aforethought." The court substituted the word "must" for "may" and deleted certain phrases, as follows: "Malice ~~may~~ must be ~~either~~ express ~~or implied~~. Malice is express when there is manifested an intention unlawfully to kill a human being. ~~Malice is implied when: 1. The killing resulted from an intentional act, 2. The natural consequences of the act are dangerous to human life, and 3. The act was deliberately performed with knowledge of the danger to, and with conscious disregard for, human life.~~" In addition, the court gave this modified version of CALJIC No. 8.30, adding the underlined material: "Murder of the second degree is the unlawful killing of a human being with malice aforethought when there is manifested an intention unlawfully to kill a human being but the evidence is insufficient to establish deliberation or premeditation <u>or murder in the commission or attempted commission of rape or lewd act on a child</u>."

should have instructed on these two lesser included offenses, defendant points to the following evidence: the testimony of prosecution witness Dr. Eva Hauser, a pathologist with the Los Angeles County Coroner's Office, that shaking, together with blunt force trauma, caused baby Amanda's death; that baby Amanda was sexually molested before she was shaken; and that all of the injuries were inflicted within six hours. Defendant also mentions Dennis Morgan's testimony that defendant had told him he shook Amanda to stop her from crying, and defendant notes his own testimony that he shook Amanda to arouse her from unconsciousness.

We need not decide whether this evidence constituted substantial evidence supporting instructions on the lesser included offenses of implied-malice second degree murder and involuntary manslaughter. The jury expressly found the existence of two special circumstance allegations, that defendant killed Amanda while perpetrating the felony offenses of rape and of lewd conduct with a child under age fourteen. (§ 190.2, former subd. (a)(17)(iii) and (v).) Given these findings, the jury necessarily determined that the killing of Amanda was first degree felony murder perpetrated in the commission of rape and lewd conduct and not any lesser form of homicide. (*People* v. *Price, supra,* 1 Cal.4th 324, 464.)[8] Therefore, any error in failing to instruct on implied-malice second degree murder and involuntary manslaughter was necessarily harmless.

### 2. *Trial court's refusal to give defendant's "pinpoint" instructions*

 Defendant contends that the trial court committed reversible error in refusing three defense instructions that, according to defendant, "pinpointed" the defense theory. Upon request, a trial court must give jury instructions "that 'pinpoint[] the theory of the defense,' " but it can refuse instructions that highlight " 'specific evidence as such.' " (*People* v. *Wright* (1988) 45 Cal.3d 1126, 1137 [248 Cal.Rptr. 600, 755 P.2d 1049]; see *People* v. *Saille* (1991) 54 Cal.3d 1103, 1119 [2 Cal.Rptr.2d 364, 820 P.2d 588].) Because the latter type of instruction "invite[s] the jury to draw inferences favorable to one of the parties from specified items of evidence," it is considered "argumentative" and therefore should not be given. (*People* v. *Gordon, supra,* 50 Cal.3d 1223, 1276; accord, *People* v. *Mincey* (1992) 2 Cal.4th 408, 437 [6 Cal.Rptr.2d 822, 827 P.2d 388].)

 Here, two of the defense instructions, labeled instruction "Q" and instruction "Q-2," were plainly argumentative and thus properly rejected by

---

[8] Although in finding the special circumstances to be true the jury also found that defendant killed Amanda in the commission of sodomy, a felony (§ 190.2, former subd. (a)(17)(iv)), the prosecution did not charge defendant with felony murder based on sodomy.

the trial court.[9] The third instruction read: "Evidence has been offered that a third party is the perpetrator of the charged offense. It is not required that the defendant prove this fact beyond a reasonable doubt. In order to be entitled to a verdict of acquittal, it is only required that such evidence raise a reasonable doubt in your minds of the defendant's guilt." Even assuming that this proposed instruction accurately pinpointed the defense theory, defendant suffered no prejudice from the trial court's refusal to give it. The jury was instructed under CALJIC No. 2.90 that the prosecution had to prove defendant's guilt beyond a reasonable doubt, and the jury knew from defense counsel's argument the defense theory that Dennis Morgan, not defendant, had committed the crimes. Under these circumstances, it is not reasonably probable that had the jury been given defendant's proposed pinpoint instruction, it would have come to any different conclusion in this case. (*People* v. *Watson, supra*, 46 Cal.2d 818, 836-837.)

### H. *Sufficiency of Evidence*

Defendant challenges the evidence as insufficient to support not only his conviction for first degree felony murder of 18-month-old Amanda, but also the jury's "true" findings on the special circumstance allegations that the killing occurred in the commission or attempted commission of the felonies of rape, sodomy, and lewd conduct. In addition, defendant argues that no substantial evidence supports the jury's finding that he was the perpetrator of these crimes. We reject these contentions.

In considering a claim of insufficiency of evidence, a reviewing court must determine "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." (*Jackson* v. *Virginia* (1979) 443 U.S. 307, 319 [99 S.Ct. 2781, 2789, 61 L.Ed.2d 560], original italics; *People* v. *Marshall* (1997) 15 Cal.4th 1, 34 [61 Cal.Rptr.2d 84, 931 P.2d 262]; *People* v. *Johnson* (1980) 26 Cal.3d 557, 578 [162 Cal.Rptr. 431, 606 P.2d 738, 16 A.L.R.4th 1255].) Where, as here, the jury's findings rest to some degree upon circumstantial evidence, we must decide whether the circumstances reasonably justify those findings, "but our opinion that the circumstances also might reasonably be reconciled with a

---

[9]Defendant's proposed instruction "Q" invited the jury to consider defense evidence regarding Dennis Morgan (for instance, whether he "has any physical characteristics consistent with those attributable to the perpetrator of the crime," and whether he "had personal knowledge of the details of the crime which only the true perpetrator could have known") in deciding whether there was "a reasonable doubt as to the true identity of the person who killed the decedent." Defendant's instruction "Q-2" directed the jury to find defendant not guilty upon finding "that there is direct or circumstantial evidence linking the third party to the actual perpetration of the crime, and that the crime could only have been committed by one person, and that such evidence creates a reasonable doubt as to the defendant's guilt."

contrary finding" does not render the evidence insubstantial. (*People* v. *Proctor* (1992) 4 Cal.4th 499, 528-529 [15 Cal.Rptr.2d 340, 842 P.2d 1100].)

 A murder is of the first degree when "committed in the perpetration of, or attempt to perpetrate" several enumerated felonies including rape and lewd conduct. (§ 189.) "[A] killing is committed in the perpetration of an enumerated felony if the killing and the felony 'are parts of one continuous transaction.' " (*People* v. *Hayes* (1990) 52 Cal.3d 577, 631 [276 Cal.Rptr. 874, 802 P.2d 376]; *People* v. *Ainsworth* (1988) 45 Cal.3d 984, 1016 [248 Cal.Rptr. 568, 755 P.2d 1017].) "[T]he reach of the felony-murder special circumstance is equally broad." (*People* v. *Hayes*, *supra*, at pp. 631-632.)

 The prosecution's theory in this case was that defendant killed baby Amanda in the commission of the felonies of rape and lewd conduct. Section 261, subdivision (a)(2) defines rape as an act of sexual intercourse accomplished "by means of force." The crime is complete upon "[a]ny sexual penetration, however slight." (§ 263.) Vaginal redness consistent with penetration by an adult penis constitutes evidence sufficient to establish rape. (*People* v. *Holt* (1997) 15 Cal.4th 619, 668-669 [63 Cal.Rptr.2d 782, 937 P.2d 213].) Section 288, subdivision (a) defines lewd conduct to include any lewd or lascivious act upon the body of a child under the age of 14 with the intent of arousing or gratifying the perpetrator's "lust, passions, or sexual desires."

The prosecution also alleged and the jury found "true" allegations of three special circumstances: that defendant killed baby Amanda in the commission or attempted commission of rape, lewd conduct, and a third felony, sodomy. Section 286, subdivision (a) defines sodomy as the "contact between the penis of one person and the anus of another." "Any sexual penetration, however slight, is sufficient to complete the crime of sodomy." (*Ibid.*)

 Viewed most favorably to the prosecution, the evidence here established that 18-month-old Amanda was unconscious when she arrived at the hospital. Doctors who treated Amanda testified that she was bleeding from the vagina, which was "gaping," an abnormal condition for a child her age; her rectum showed small lacerations and tears; her anus was "wide open"; and her anal area was bruised, black and blue. An autopsy revealed dark purple bruising and hemorrhaging in the soft tissues between the vaginal and rectal areas. The pathologist who conducted the autopsy reached these conclusions: Some of Amanda's injuries were consistent with blunt

force trauma by a human penis either inside the rectum or inside the vagina, while others indicated sexual penetration although not necessarily vaginal penetration; Amanda died from multiple sharp impacts to the head coupled with severe shaking "about as hard as an adult can shake an infant"; Amanda's vaginal and rectal injuries preceded the injuries causing her death; and all of Amanda's injuries were inflicted in no more than six to eight hours, but they might have occurred within a much shorter time.

The prosecution's evidence also established that defendant was alone with baby Amanda during the eight-hour period in which she was sexually assaulted and sustained the fatal injuries. Defendant was also the only adult present with Amanda when Los Angeles County firefighter Daniel Elkins took the unconscious baby to the hospital. Defendant told several false and misleading tales to friends and family about what had happened to Amanda, and he fled from the police, both indicative of his consciousness of guilt. (See *People* v. *Roybal* (1998) 19 Cal.4th 481, 517 [79 Cal.Rptr.2d 487, 966 P.2d 521]; *People* v. *Kipp, supra*, 18 Cal.4th 349, 375.)

The evidence is sufficient to support defendant's conviction for first degree felony murder in the commission of the felonies of rape and lewd conduct as well as the three special circumstance findings of murder in the commission of rape, lewd conduct, and sodomy.[10]

[10]At oral argument, defense counsel argued that the testimony of two of Virginia MacNair's neighbors, Patricia Lathrop and Theresa Thompson, supported defendant's assertion that Dennis Morgan was present at MacNair's house when Amanda was fatally injured. Lathrop testified that on the afternoon of August 25, 1988, she saw a young man "run from [MacNair's] house, either the side or back." Thompson said she saw one man, whom she assumed to be defendant, leave through the front door and a second man, whom she thought "might have been a paramedic" run alongside the house. Both Lathrop and Thompson testified that it was after these observations that a fire truck arrived. According to defendant, the testimony by Lathrop and Thompson supported his version of events: Dennis Morgan left right after defendant called "911," but defendant stayed with baby Amanda until the arrival of emergency personnel, who arrived in a fire truck.

Defendant fails to persuade us that Lathrop's and Thompson's testimony established that defendant was not alone with baby Amanda. When cross-examined by the prosecutor, both witnesses were less than sure of what they had seen. Moreover, according to the testimony of firefighter Daniel Elkins, firefighters were at MacNair's house twice on the afternoon of August 25. Initially, firefighters arrived in response to a "911" call and then left to take Amanda to the hospital. On the way, they met the paramedic unit's ambulance and transferred Amanda to the ambulance, which took her to the hospital. Thereafter, the firefighters drove back to MacNair's house to retrieve a first aid kit that firefighter Elkins had inadvertently left behind.

In returning a verdict of guilt, the jury evidently accepted the prosecutor's explanation of these events advanced at oral argument: The two neighbor women did see a man leave the house *before* a fire truck arrived, but that man was defendant, and the women saw the fire truck as it was returning to McNair's house so firefighter Elkins could pick up his first aid kit.

## I. *Trial Court's Denial of Defendant's New Trial Motion*

In seeking a new trial based on newly discovered evidence, defendant presented a declaration from defense investigator Barbara Lancaster-Jordan describing a conversation with a jail inmate who claimed to have overheard from a distance of two cells away a statement by Dennis Morgan that he had been at defendant's house visiting his "granddaughter," Amanda, on the day of her injuries. The declaration stated that the inmate refused to come forward because he feared retribution by the prosecutor, who the inmate said had already punished him for cooperating with defendant's lawyers, by causing the loss of his work assignment and his transfer to the "worst" jail facility. The trial court denied the motion for a new trial, finding the inmate's story "inherently untrustworthy . . . and not worthy of belief." Defendant argues that the denial was error.

Because a ruling on a motion for new trial rests so completely within the trial court's discretion, we will not disturb it on appeal absent " ' "a manifest and unmistakable abuse of discretion." ' " (*People* v. *Turner* (1994) 8 Cal.4th 137, 212 [32 Cal.Rptr.2d 762, 878 P.2d 521].) None appears here.

### IV. PENALTY PHASE

### A. *Trial Court's Refusal to Impanel New Jury*

At the start of the penalty phase, defendant moved to impanel a new jury, claiming that comments and questions by the prosecutor during the guilt phase trial had undermined "the credibility of defense counsel, defense investigators, and potential penalty phase witnesses," including the victim's grandmother, Diane Ellison. The trial court denied the motion because of defendant's failure to establish good cause "for deviating from the clear legislative mandate of Penal Code section 190.4, subdivision (c), that both the guilt and penalty phases of the capital trial be tried by the same jury." Defendant contends that the trial court erred. We disagree.

As the trial court pointed out, subdivision (c) of section 190.4 requires that, absent good cause, the same jury decide guilt and penalty at a capital trial. "This statute ' "reflects the long-standing legislative preference for a single jury to determine both guilt and penalty." ' " (*People* v. *Bradford* (1997) 15 Cal.4th 1229, 1353 [65 Cal.Rptr.2d 145, 939 P.2d 259]; *People* v. *Lucas* (1995) 12 Cal.4th 415, 483 [48 Cal.Rptr.2d 525, 907 P.2d 373].)

Defendant insists there was good cause for impaneling a new jury because, at the guilt phase of the trial, the prosecutor implied that defendant's

claim that Dennis Morgan was the killer was a recent fabrication, questioned the credibility of Amanda's grandmother, Diane Ellison, and insinuated possible bribery and subornation of perjury by members of the defense team, including Attorney Bernstein. We reject defendant's contention that the prosecutor's conduct so poisoned the guilt phase jury that it could not fairly decide the issue of penalty.

 Good cause to discharge the guilt phase jury and to impanel a new one must be based on facts that appear " ' "in the record as a demonstrable reality" ' " showing the jury's " ' "inability to perform" ' " its function. (*People* v. *Bradford, supra,* 15 Cal.4th at p. 1354; *People* v. *Gates* (1987) 43 Cal.3d 1168, 1199 [240 Cal.Rptr. 666, 743 P.2d 301] [adopting for purposes of section 190.4, subdivision (c) the "good cause" standard from former section 1123 and section 1089].) Defendant points to no such facts here. The trial court did not abuse its discretion in declining to impanel a new jury to try the penalty phase. (See *People* v. *Bradford, supra,* at p. 1353; *People* v. *Rowland* (1992) 4 Cal.4th 238, 268 [14 Cal.Rptr.2d 377, 841 P.2d 897].)

We also reject defendant's contention that the trial court's refusal to impanel a new jury denied him his rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments of the federal Constitution. Defendant claims that the prosecutor's intimation at the guilt phase that defense attorney Bernstein tried to bribe Dennis Morgan to give testimony favorable to defendant diminished counsel's ability to competently represent defendant at the penalty phase, and that the victim's grandmother, Diane Ellison, was so discredited during the guilt phase case that defendant could not call her as his character witness at the penalty phase.

The record does not support defendant's assertion that defense attorney Bernstein's ability to function as a diligent advocate in the penalty phase was diminished by the prosecutor's eliciting, on cross-examination of Dennis Morgan, testimony that Bernstein had left a $20 bill on the table in the jail's visitor room in the presence of jail personnel. As we have already explained in part III.D.2., *ante,* at page 874, Morgan's testimony about the purported bribe was inherently unbelievable. Moreover, Attorney Bernstein did not actively participate at the penalty phase. As the trial court mentioned after the penalty phase, cocounsel Dell "did the entire penalty phase of the defense case" herself.

As to defendant's claim that Diane Ellison, the victim's grandmother, would have been a helpful witness on the issue of penalty, he made no offer of proof in the trial court regarding the substance of Ellison's proposed

testimony. Accordingly, the record fails to show that the jury's penalty phase verdict would have been different had Ellison testified. (See *People* v. *Whitt* (1990) 51 Cal.3d 620, 648 [274 Cal.Rptr. 252, 798 P.2d 849] [an appellate court must know the substance or content of intended testimony in order to assess prejudice].)

B. *Trial Court's Discharge of Juror Teresa Barragan and Alternate Juror William Ayala*

 Defendant contends the trial court abused its discretion in discharging Juror Teresa Barragan during penalty phase deliberations. These are the relevant facts:

Late in the afternoon of Wednesday, December 11, 1991, the trial court submitted the penalty phase case to the jury. The jury deliberated the remainder of that day and throughout the next day. On Friday, December 13, before the jury had assembled, Juror Barragan asked the trial court to excuse her from further jury service. Barragan explained that her employer had stopped paying her for jury service early in November and that she had already used four weeks of vacation time to remain on the jury. When the trial court inquired of Barragan whether it would be a hardship for her to continue, she replied: "I would either have to take vacation or not get paid period." Over defense objection, the trial court excused Juror Barragan for financial hardship. The trial court immediately selected one of the alternates, Henry Rufo, to replace Barragan and instructed the jury to begin its deliberations anew. On Monday, December 16, the next court day, the jury asked to have the medical examiner's testimony from the guilt phase read back. After the jury heard the reading of the testimony, it resumed deliberations, and shortly thereafter reached its verdict.

 Section 1089 provides for the discharge of a juror "before or after the final submission of the case to the jury" for "good cause" shown. In reviewing a trial court's decision either to retain or discharge a juror, we use the deferential "abuse of discretion" standard. (*People* v. *Lucas, supra*, 12 Cal.4th 415, 489; *People* v. *Beeler* (1995) 9 Cal.4th 953, 975 [39 Cal.Rptr.2d 607, 891 P.2d 153].) And we will uphold the decision unless it " 'falls outside the bounds of reason.' " (*People* v. *Kipp, supra*, 18 Cal.4th 349, 371, quoting *People* v. *De Santis* (1992) 2 Cal.4th 1198, 1226 [9 Cal.Rptr.2d 628, 831 P.2d 1210].) In the past, we have upheld a trial court's decision to discharge a juror for "good cause" when continued jury service would force the cancellation of a juror's scheduled vacation (*People* v. *Lucas, supra*, at pp. 488-489), would be a financial hardship on the juror (see *People* v. *Mickey* (1991) 54 Cal.3d 612, 665 [286 Cal.Rptr. 801, 818 P.2d 84]), or

when a juror who anticipated starting a new job needed additional time to complete certain paperwork related to her old position (*People* v. *Fudge* (1994) 7 Cal.4th 1075, 1098-1099 [31 Cal.Rptr.2d 321, 875 P.2d 36]).

 Here, Juror Barragan's employer had stopped paying her for jury service one month earlier and she had used her own vacation time during that month to continue to serve on the jury. For Barragan to remain on the jury would under the circumstances have been a financial hardship. As we observed in *People* v. *Lucas, supra,* 12 Cal.4th 415, 489, a juror facing personal hardship might feel "some pressure to bring the penalty deliberations to a speedy close." On the facts of this case, the trial court's discharge of Juror Barragan was not an abuse of discretion.

Defendant also argues that Barragan's discharge from jury service seriously disrupted the penalty phase deliberative process in violation of the Fifth, Sixth, and Eighth Amendments to the federal Constitution. Defendant did not object on these constitutional grounds in the trial court and thus has not preserved this issue for appeal. As we said in *People* v. *Mickey, supra,* 54 Cal.3d 612, 664: "A defendant may properly raise in this court a point involving an allegedly improper excusal for undue personal hardship only if he made the same point below. The requirement of a contemporaneous and specific objection promotes the fair and correct resolution of a claim of error both at trial and on appeal, and thereby furthers the interests of reliability and finality. When a contemporaneous and specific objection is made, the parties are put on notice to characterize the claim as they think proper and to set out the law and facts as they deem necessary. With their response, the trial court is provided with a basis on which to define the claim and then determine whether it is meritorious and, if so, how any harm may be avoided or cured as promptly and completely as possible. On such a record, the appellate court may then decide whether a challenge to the trial court's ruling is sound."

Also not preserved for appeal is defendant's contention that the trial court abused its discretion in discharging for financial hardship one of the alternate jurors, William Ayala, on December 9, 1991, before the start of the penalty phase. In the trial court, defendant did not object to Ayala's discharge. Accordingly, we do not consider the issue.

C. *Prosecutor's Questions and Comments*

1. *Cross-examining two defense witnesses*

 Defendant contends that in cross-examining defense witnesses Gloria Carl and James Park, the prosecutor committed prejudicial misconduct

that violated not only state law but also the Fifth, Sixth, Eighth, and Fourteenth Amendments to the federal Constitution. We disagree.

Defense witness Gloria Carl was a cook who had befriended defendant at the juvenile hall where he was housed at various times throughout his early teenage years. In Carl's view, defendant got into trouble as a teenager because he wanted attention and because his home life lacked structure. On cross-examination, the prosecutor, without objection, established that defendant's juvenile offenses included safecracking, entering a bank, and joyriding. The trial court sustained defense objections to several questions intended to establish that Carl knew that as time passed, defendant's crimes got more severe. The trial court also sustained a defense objection to the prosecutor's question whether in the years that defendant was in and out of juvenile hall, Carl considered him to be a sociopath.

Defense witness James Park had been the assistant warden at San Quentin prison, and in various other capacities had been employed in the California prison system for 40 years. Based on a short discussion with defendant, defendant's prior record, and defendant's age, Park expressed the view that defendant would "make a good adjustment within the confines of [a maximum security] prison." In response to defense counsel's question whether Park thought defendant would pose a danger to prison guards or other prisoners, Park answered: "I cannot see that he would be a danger under any condition in the high security prison." On cross-examination, the prosecutor inquired whether Park made his evaluation of defendant's future dangerousness based on a "smattering" of information. The prosecutor also asked, "If you are wrong and another victim results from it, do you suffer any loss . . . do you get less money for your [consulting] work?" The trial court sustained defense objections to both questions as argumentative.

A prosecutor does not commit misconduct by challenging the credibility of a defense witness or the basis for the witness's good opinion of a defendant. " 'If the defense chooses to raise [a] subject, it cannot expect immunity from cross-examination on it.' " (*People* v. *Morris* (1991) 53 Cal.3d 152, 219 [279 Cal.Rptr. 720, 807 P.2d 949]; *People* v. *Gates, supra*, 43 Cal.3d 1168, 1211.) Furthermore, a prosecutor can properly explore on cross-examination the basis for an expert's prediction that a capital defendant will pose no future danger if sentenced to life without parole. (*People* v. *Morris, supra*, at p. 219.) Although here some of the prosecutor's questions were argumentative, we are satisfied that, under any standard of prejudice, the questioning did not affect the outcome of the penalty phase.

### 2. *Prosecutor's comment on role of mitigation*

The prosecutor began his penalty phase argument to the jury by pointing out that the case dealt with "the destruction of human life." He

continued: "[W]e have come through literally thousands of years of evolution, social evolution as society has developed, and the only hope basically to preserve any kind of civilized society is to set boundary lines beyond which no person is allowed to go and throughout these thousands of years of social evolution we have done that. [¶] And particularly in California, since that's where we are today, we have evolved to a point where we said that *there are enumerated crimes that if you commit these crimes you forfeit your right not only to exist in society but to exist in human society unless, unless there are factors in mitigation which justify your continued existence.*" (Italics added.) Defense counsel objected to the argument as misstating the law. The trial court overruled the objection, immediately telling the jury that "if there is anything that counsel states . . . that conflicts with my instructions on the law, you will ignore counsel and . . . accept my instructions." Defendant contends the ruling was in error.

According to defendant, the prosecutor's comment that we italicized above was a deliberate misstatement of law that misled the jury into believing that it must sentence defendant to death unless he presented evidence in mitigation. Defendant points to decisions of this court holding that the California capital scheme does not create a presumption or bias in favor of the death penalty merely by directing the jury deciding penalty to consider as factors in aggravation "the circumstances of the crime" and "the existence of any special circumstances." (See *People* v. *Rodrigues, supra,* 8 Cal.4th 1060, 1195; *People* v. *Stansbury* (1993) 4 Cal.4th 1017, 1065 [17 Cal.Rptr.2d 174, 846 P.2d 756].)

Viewed in isolation, the prosecutor's comment at issue might seem to convey, contrary to statements in our previous decisions, that once a defendant is convicted of a crime carrying the death penalty, he or she necessarily forfeits the right "to exist" unless there are factors in mitigation. But when the comment is considered in light of the prosecutor's entire argument, it is apparent that the prosecutor did not, deliberately or otherwise, mislead the jury into believing that defendant entered the penalty phase of his capital trial under a presumption of death. In his very next sentence, the prosecutor stated that a conviction of certain "enumerated crimes" merely "exposes" a person to the death penalty. And throughout his argument, the prosecutor stressed that for the jury to return a death sentence "the factors in aggravation have to substantially outweigh any factors in mitigation." In addition, the trial court instructed the jury under CALJIC No. 8.88 that "[t]o return a judgment of death, each of you must be persuaded that the aggravating circumstances are so substantial in comparison with the mitigating circumstances that it warrants death instead of life without parole." The court also told the jury to ignore any statements of counsel that conflicted with the

court's instructions on the law. It is therefore not reasonably possible that the jury would have believed it had to impose a sentence of death unless defendant presented mitigating evidence.[11]

### D. *Adequacy of Trial Counsel*

Defendant asserts that counsel's conduct of the penalty phase fell below the standard of a reasonably competent lawyer acting as a diligent advocate as required by the federal Constitution's Sixth Amendment. Defendant faults counsel for failing to argue that 18-month-old Amanda's death could have been accidental.

"A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.' [Citation.]" (*Strickland* v. *Washington, supra,* 466 U.S. 668, 689 [104 S.Ct. 2052, 2065]; *People* v. *Fairbank* (1997) 16 Cal.4th 1223, 1243 [69 Cal.Rptr.2d 784, 947 P.2d 1321].) When, as here, defense counsel's reasons for conducting the defense case in a particular way are not readily apparent from the record, we will not assume inadequacy of representation unless there could have been " 'no conceivable tactical purpose' " for counsel's actions. (*People* v. *Hines, supra,* 15 Cal.4th 997, 1065; *People* v. *Diaz* (1992) 3 Cal.4th 495, 558 [11 Cal.Rptr.2d 353, 834 P.2d 1171].)

We cannot conclude in this case that counsel could have had "no conceivable tactical purpose" in not arguing that Amanda's death could have

---

[11]Defendant also asserts that by overruling the defense objection to the prosecutor's comment, the trial court endorsed a statement of law that violates the Eighth Amendment to the federal Constitution. Not so. Defendant's argument rests on *Adamson* v. *Ricketts* (9th Cir. 1988) 865 F.2d 1011, 1042, in which an in bank panel of the federal appeals court struck down a provision in Arizona's capital scheme as contrary to the Eighth Amendment, reasoning that it imposed a "presumption of death." But, as defendant acknowledges, two years later the United States Supreme Court, in *Walton* v. *Arizona* (1990) 497 U.S. 639 [110 S.Ct. 3047, 111 L.Ed.2d 511], upheld the constitutionality of Arizona's death penalty statute, which provides that the trial court "shall" impose the death penalty upon a finding of at least one aggravating circumstance if the mitigating evidence is insufficient to call for leniency. Here, the trial court in overruling the defense objection to the prosecutor's comment did not endorse the view that California law was similar to Arizona's in requiring imposition of the death penalty absent sufficient mitigating evidence. Rather, as we noted in the text, in overruling the objection, the trial court cautioned the jury that statements of counsel were not the law, and the court thereafter instructed the jury in accord with California law.

been accidental. Counsel may have rejected this argument as too likely to antagonize the jury, given that the coroner's evidence suggested that Amanda's fatal injuries from blunt force trauma to the head and severe shaking were deliberately inflicted.

Defendant also asserts that counsel performed deficiently by telling the jury in penalty phase closing argument that "the aggravation of this crime alone" outweighs any mitigation. According to defendant, by this statement defense counsel effectively "conceded" that the jury should return a verdict of death. We disagree.

Although defense counsel did tell the jury that the aggravating factors of defendant's crime outweighed the mitigating evidence, she did so as part of her argument that a juror *cannot* vote for a verdict of death simply because the juror concludes that the evidence in aggravation outweighs that in mitigation. Rather, counsel argued that under our law, if the evidence in aggravation outweighs that in mitigation, *"but not substantially,"* the juror must vote for life without parole and not death. (Italics added.) Counsel's argument was consistent with the trial court's instruction to the jury that "[t]o return a judgment of death, each of you must be persuaded that the aggravating circumstances *are so substantial* in comparison with the mitigating circumstances that it warrants death instead of life without parole." (Italics added.) Counsel also argued that even when "aggravation *substantially* outweighs the mitigation," a juror must still vote for life without parole if the juror believes that death is not the appropriate punishment. (Italics added.)

Although defense counsel acknowledged that no mitigating evidence could ever excuse these crimes, she did so while forcefully arguing that even if aggravation outweighed mitigation, that circumstance was insufficient to justify a vote in favor of the death penalty. We cannot say that counsel could have had "no conceivable tactical purpose" for this argument in light of the depraved and repugnant nature of defendant's crimes, raping and sodomizing an 18-month-old baby and then causing her death by severe shaking and blunt force trauma to her head.

We also disagree with defendant's assertion that counsel's failure to present medical evidence of defendant's father's brain damage leading to his suicide cannot be attributed to a sound tactical decision. As defendant notes, trial counsel made an offer of proof that medical records would establish the brain damage and its link to the father's suicide, and defense counsel asked the prosecutor to stipulate to their admission. But after the prosecutor asked to see the documents, counsel made no further mention of them. Defendant

asserts that his counsel simply neglected to pursue the stipulation or to introduce the medical records. It is equally possible, however, that the medical evidence failed to establish the facts as asserted by defense counsel, or that they included additional matter harmful to defendant's case in mitigation that counsel hoped to avoid. Accordingly, it is not apparent from the record that there was no sound tactical basis for defense counsel's failure to pursue the medical evidence.

### E. Jury Instructions

#### 1. Instruction on aggravating and mitigating circumstances

 The trial court read to the jury CALJIC No. 8.85 (1988 rev.), the standard instruction describing the aggravating and mitigating circumstances set forth in section 190.3. The court refused two of defendant's instructions that would have told the jury that aggravating factors are limited to those listed in the instruction, and directed it to disregard "any other facts or circumstances" as a basis for imposing the death penalty. Defendant contends that "CALJIC No. 8.85 given without further elaboration is unconstitutionally vague," because it fails to limit the jury to considering only specified factors in aggravation and because it permits a prosecutor to argue nonstatutory matters as factors in aggravation.[12] Citing the Fifth, Sixth, Eighth, and Fourteenth Amendments to the federal Constitution, defendant argues that the unmodified instruction "allowed the penalty decision process to proceed in an arbitrary, capricious, death-biased and unreviewable manner." Not so.

Recently, in *People* v. *Musselwhite* (1998) 17 Cal.4th 1216, 1266 [74 Cal.Rptr.2d 212, 954 P.2d 475], we rejected a similar "vagueness" challenge to CALJIC No. 8.85 based on the instruction's failure to specify which of the enumerated sentencing factors were aggravating and which were mitigating. There we characterized the defendant's argument as resting "on a misunderstanding of what might be described as the 'architecture' of California's death penalty scheme." (17 Cal.4th at p. 1266.) Likewise, defendant's argument here displays a fundamental misunderstanding of the differing constitutional requirements for the narrowing and sentence-selection aspects of a state's capital sentencing law. (*Ibid.*; see *People* v. *Bacigalupo* (1993) 6 Cal.4th 457, 467-470, 476 [24 Cal.Rptr.2d 808, 862 P.2d 808] ["It would be inconsistent with the purpose and function of the section 190.3

---

[12]Apparently to illustrate this latter point, defendant highlights certain comments by the prosecutor, which purportedly urged the jury to consider as aggravating evidence aspects of defendant's background and character, as not falling within any statutory factor. Having reviewed the comments, we disagree with defendant's assessment.

sentencing factors to require those factors to satisfy the Eighth Amendment requirements" for the narrowing aspect of a death penalty scheme.].)

We also reject several constitutional challenges directed at CALJIC No. 8.85 that are essentially identical to challenges we have previously rejected with regard to California's death penalty law itself. Thus, the jury instruction is not unconstitutional for failing to "exclude nonstatutory, unspecified aggravating factors as a basis for the death penalty." (*People* v. *Rodriguez* (1986) 42 Cal.3d 730, 777 [230 Cal.Rptr. 667, 726 P.2d 113]; accord, *People* v. *Hawthorne* (1992) 4 Cal.4th 43, 80 [14 Cal.Rptr.2d 133, 841 P.2d 118].) Nor need the instruction "identify particular sentencing factors because their aggravating or mitigating nature is clear." (*People* v. *Frye, supra,* 18 Cal.4th 894, 1026; *People* v. *Ray* (1996) 13 Cal.4th 313, 359 [52 Cal.Rptr.2d 296, 914 P.2d 846].) The aggravating factors described in CALJIC No. 8.85 are not unconstitutionally "vague" or "arbitrary." (*People* v. *Arias* (1996) 13 Cal.4th 92, 187-188 [51 Cal.Rptr.2d 770, 913 P.2d 980]; *People* v. *Cudjo* (1993) 6 Cal.4th 585, 637 [25 Cal.Rptr.2d 390, 863 P.2d 635]; *People* v. *Bacigalupo, supra,* 6 Cal.4th 457, 478-479.) The Fifth, Eighth, and Fourteenth Amendments to the federal Constitution do not require the jury to be instructed to find the existence of aggravating circumstances or the appropriateness of the death penalty beyond a reasonable doubt. (*People* v. *Frye, supra,* at p. 1029; *People* v. *Rodriguez, supra,* at pp. 777-779.) The trial court did not err in declining to require written jury findings that aggravating factors substantially outweigh mitigating factors or that death was the appropriate penalty. (*People* v. *Kipp, supra,* 18 Cal.4th 349, 381; *People* v. *Clark* (1993) 5 Cal.4th 950, 1040 [22 Cal.Rptr.2d 689, 857 P.2d 1099].) Furthermore, the trial court had no obligation to modify the instruction to delete inapplicable aggravating and mitigating factors. (*People* v. *Ramos, supra,* 15 Cal.4th 1133, 1183; *People* v. *Cain* (1995) 10 Cal.4th 1, 80 [40 Cal.Rptr.2d 481, 892 P.2d 1224].)[13]

2. *Instructing jury to "disregard" guilt phase instructions*

██ When the prosecutor cross-examined Dennis Morgan during the guilt phase of the trial, Morgan blurted out that defendant had a prior arrest for child molestation. The trial court immediately struck the statement from the record and told the jury: "Ladies and gentlemen, you are going to ignore that and strike that. There is absolutely no evidence of that in existence."

---

[13]We also reject defendant's assertion that by failing to delete "extraneous" factors, the trial court enabled the prosecutor to engage in improper argument. It was not improper for the prosecutor to argue that defendant had presented no evidence of mental disease or moral justification, or to urge the jury that death was the appropriate punishment notwithstanding the mitigating evidence.

After a brief bench conference, the court advised the jury "there has been no other arrests for any other molestation . . . you are to disregard anything you have heard to the contrary; it hasn't happened."

When instructing on the law applicable to the penalty phase, the trial court told the jury to "[d]isregard all other instructions given to you in other phases of this trial." (CALJIC No. 8.84.1 (1989 rev.).) Defendant contends that this instruction required the penalty jurors to disregard the trial court's instruction at the guilt phase that defendant had never been arrested for child molestation, thus allowing the jurors to rely on Morgan's assertion that defendant had a prior arrest for child molestation. We disagree.

At the guilt phase, the trial court not only instructed the jury that defendant had no prior arrests for child molestation, it also made a finding of fact that there was no evidence of such arrests. No juror reasonably would have understood the trial court's penalty phase instruction to disregard instructions given at the guilt phase as permitting consideration of arrests for child molestation unsubstantiated by any evidence.

### 3. *Trial court's refusal of defendant's proposed instructions*

Defendant contends that the trial court erred in refusing to give the jury several special instructions defendant had requested. We discuss each of these below.

Special instruction "D" and special instruction "E" would have precluded the jury from considering as aggravating evidence the facts supporting the murder conviction and the special circumstance findings unless those facts established "something in addition" to the elements of the crime or the special circumstance. According to defendant, without these instructions he was subjected to an arbitrary, capricious, death-biased, and unreviewable process in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments to the federal Constitution. We find no error.

"[S]ection 190.3, factor (a), specifically permits the jury to consider at the penalty phase '[t]he circumstances of the crime of which the defendant was convicted in the present proceeding and the existence of any special circumstances found to be true . . . .' As we have held, the trial court need not give a ' "clarifying gloss" ' on factor (a) ' "to inform the jury that its penalty determination must not be based on facts that are 'common to all homicides.' " ' [Citation.] The argument to the contrary reveals 'a "basic misunderstanding" ' of the statutory scheme since, in order to perform its

moral evaluation of whether death was the appropriate penalty, the facts of the murder "cannot comprehensively be withdrawn from the jury's consideration . . . ." ' [Citation.]" (*People* v. *Hawkins* (1995) 10 Cal.4th 920, 965-966 [42 Cal.Rptr.2d 636, 897 P.2d 574].) In addition, there is no constitutional requirement that in considering the aggravating circumstances of a capital crime, the penalty phase jury must "factor out" those constituent parts common to all first degree premeditated or felony murders. (*Id.* at p. 966; accord, *People* v. *Millwee* (1998) 18 Cal.4th 96, 164 [74 Cal.Rptr.2d 418, 954 P.2d 990] [rejecting the argument that "double counting" of facts common to all first degree murders as facts in aggravation precludes any meaningful distinction between those who are sentenced to death and those who are not].) The same is true with regard to facts establishing the special circumstances.

In this case, however, the trial court did instruct the jury to "factor out" the elements of the capital offense when considering it as an aggravating circumstance. The trial court's instructions included CALJIC No. 8.88 (1989 rev.), which in relevant part told the jury: "An aggravating factor is any fact, condition or event attending the commission of a crime which increases its guilt or enormity, or adds to its injurious consequences which is above and beyond the elements of the crime itself." Defendant's requested special instructions "D" and "E" would have been duplicative of this instruction.

Special instruction "F" would have directed the jury's attention to the particular mitigating evidence defendant presented in this case.[14] We have previously held that instructions such as this are both argumentative and duplicative of the standard jury instruction directing consideration of factors in mitigation and aggravation (see CALJIC No. 8.85), and thus need not be given. (*People* v. *Musselwhite*, *supra*, 17 Cal.4th 1216, 1269-1270; *People* v. *Noguera* (1992) 4 Cal.4th 599, 648 [15 Cal.Rptr.2d 400, 842 P.2d 1160].)

---

[14]Proposed special instruction "F" stated: "In determining whether to impose the punishment of imprisonment without the possibility of parole or death, you may consider the following mitigating factors, if applicable: (a) Whether the manner in which the crime was committed demonstrated a lack of criminal sophistication or professionalism on the part of Ricky Lee Earp; (b) Whether the crime was committed because of an unusual circumstance which is unlikely to recur; (c) Whether Ricky Lee Earp has an insignificant record of prior criminal conduct; (d) Whether Ricky Lee Earp came from a deprived home or had a deprived education or social background; (e) Whether Ricky Lee Earp was subjected to physical abuse or cruelty during his formative years; (f) Whether Ricky Lee Earp, while in prison, endeavored to obtain an education and exhibited good behavior; (g) Whether there are any other aspects of Ricky Lee Earp's background and history which mitigate the commission of the offense."

Special instruction "I" would have told the jury that "the law of this state does not place any specific weight or numerical value on any particular aggravating or mitigating circumstance." It also stated that "[o]ne mitigating circumstance may be sufficient to support a decision that death is not the appropriate punishment in this case" and that "[t]he weight you each give to any factor is for you individually to decide." Special instruction "S" read: "The choice you make is not simply between good and bad, but between the punishment of life imprisonment without possibility of parole and death. To vote for a death sentence it is not enough to find more bad than good about Ricky Lee Earp. Rather, you must be persuaded that the unfavorable evidence is so substantial in comparison with the favorable that it warrants death instead of life imprisonment without possibility of parole. You are permitted to return a verdict for death only if you conclude that the aggravating factors outweigh the mitigating so substantially that a death sentence is justified and appropriate under all the circumstances. In such a case, you are permitted to return a verdict for death, but you are not required to do so. [¶] But if you conclude that the mitigating factors are equal to or outweigh the aggravating, you must return a verdict for confinement in the state prison for life without possibility of parole. Both the People and Ricky Lee Earp are entitled to the individual opinion of each juror. Each of you must decide the matter for yourself, after a full discussion of the evidence and instructions with the other members of the jury."

Special instructions "I" and "S" were both properly rejected as duplicating aspects of the trial court's comprehensive instruction (CALJIC No. 8.88 (1989 rev.)) on weighing aggravating and mitigating evidence and deciding on the appropriate penalty. That instruction in relevant part told the jury: "The weighing of aggravating and mitigating circumstances does not mean a mere mechanical counting of factors on each side of an imaginary scale, or the arbitrary assignment of weights to any of them. [¶] You are free to assign whatever moral or sympathetic value you deem appropriate to each and all of the various factors you are permitted to consider. In weighing the various circumstances you determine under the relevant evidence which penalty is justified and appropriate by considering the totality of the aggravating circumstances with the totality of the mitigating circumstances. To return a judgment of death, each of you must be persuaded that the aggravating circumstances are so substantial in comparison with the mitigating circumstances that it warrants death instead of life without parole."

Defendant's special instructions "I" and "S" also duplicated the trial court's advisement that "[t]he People and the defendant are entitled to the individual opinion of each juror." (CALJIC No. 17.40 (1988 rev.).) A trial court need not give duplicative instructions. (See *People* v. *Jones* (1998) 17

Cal.4th 279, 314 [70 Cal.Rptr.2d 793, 949 P.2d 890]; *People* v. *Hines, supra,* 15 Cal.4th 997, 1068.) In addition, special instruction "I" was argumentative because it would have advised the jury that a single mitigating circumstance can be dispositive of penalty without stating the same as to a single aggravating circumstance. (*People* v. *Mickey, supra,* 54 Cal.3d 612, 697.) The trial court did not err in declining to give these special instructions.

In special instruction "T," defendant asked the trial court to instruct that each juror individually "bears the ultimate moral responsibility to determine the appropriate penalty . . . ." The trial court properly declined this proposed instruction, which was argumentative and also duplicated the advisement in CALJIC No. 17.40 that each juror was to form an "individual opinion."

Also properly rejected was special instruction "Y," which stated: "The law does not have a preference for the punishment of death, but rather leaves it entirely up to you based upon the instructions I have given you, to determine which penalty is appropriate." A correct statement of the sentencing standard under California law is that our law "expresses no preference as to the appropriate punishment." (*People* v. *Samayoa* (1997) 15 Cal.4th 795, 852 [64 Cal.Rptr.2d 400, 938 P.2d 2]; *People* v. *Hayes, supra,* 52 Cal.3d 577, 643.) Therefore, by stating that the law does not have a preference for the punishment of death without also stating that it has no preference for the punishment of life without possibility of parole, special instruction "Y" was misleading and argumentative. (See *People* v. *Mickey, supra,* 54 Cal.3d 612, 697.)

Special instruction "V" would have told the jury that the sentence of life in prison without parole "means exactly what the words state," and that, if imposed, would require defendant "to be confined in the state prison for his natural life without the possibility of parole." We have held that such instruction is inaccurate: " 'It is . . . incorrect to tell the jury the penalty of death or life without possibility of parole will inexorably be carried out' . . . ." (*People* v. *Mickey, supra,* 54 Cal.3d 612, 701; accord, *People* v. *Hines, supra,* 15 Cal.4th 997, 1069.)

Defendant also contends that he was denied his rights under the federal Constitution's Fifth, Sixth, Eighth, and Fourteenth Amendments when the trial court refused to instruct the jury to consider as a factor in mitigation any "lingering doubt" about defendant's guilt of the capital crime. There is no constitutional entitlement to instructions on lingering doubt.

(*Franklin* v. *Lynaugh* (1988) 487 U.S. 164, 173-174 [108 S.Ct. 2320, 2327-2328, 101 L.Ed.2d 155]; *People* v. *Frye, supra*, 18 Cal.4th 894, 1027; *People* v. *Johnson, supra*, 3 Cal.4th 1183, 1252.) "This is not to say that the jury's consideration of any such doubt is improper; the defendant may urge his possible innocence to the jury as a factor in mitigation." (*People* v. *Johnson, supra*, at p. 1252.) Instructions directing the jury to consider the circumstances of the crime (§ 190.3, factor (a)) and any other circumstance that extenuates the gravity of the crime (*id.*, factor (k)) necessarily encompass the concept of lingering doubt, and thus render any special instruction on the concept unnecessary. (*People* v. *Frye, supra*, at p. 1027; *People* v. *Hines, supra*, 15 Cal.4th 997, 1068.) Here, the question of "lingering doubt" was properly put before the penalty phase jury when defense counsel argued that jurors should consider whether they "were absolutely certain" that defendant killed 18-month-old Amanda. There was no error.

### F. *Cumulative Effect of Errors*

Defendant asserts that even if nonprejudicial when considered individually, the cumulative effect of errors at the guilt and penalty phases warrants reversal of the judgment of death.

We have rejected most of defendant's contentions of error on the merits. With regard to the others, we conclude that they neither separately nor cumulatively establish such prejudice. Defendant was not denied his constitutional rights to a fair trial or to a reliable penalty verdict. (U.S. Const., 5th, 8th, & 14th Amends.)

### G. *Constitutionality of California's Death Penalty Law*

Defendant raises a number of issues regarding the constitutionality of California's 1978 capital sentencing scheme. As discussed below, we have previously rejected these claims in past decisions and we decline to reconsider them here.

The special circumstances satisfy the constitutionally mandated "narrowing" function because they do " 'not apply to every defendant convicted of a murder[, but only] to a subclass of defendants convicted of murder.' " (*People* v. *Arias, supra*, 13 Cal.4th 92, 187, quoting *Tuilaepa* v. *California* (1994) 512 U.S. 967, 972 [114 S.Ct. 2630, 2634-2635, 129 L.Ed.2d 750]; accord, *People* v. *Barnett, supra*, 17 Cal.4th 1044, 1179;

*People* v. *Samayoa, supra,* 15 Cal.4th 795, 863; *People* v. *Wader* (1993) 5 Cal.4th 610, 669 [20 Cal.Rptr.2d 788, 854 P.2d 80]; see also *People* v. *Bacigalupo, supra,* 6 Cal.4th 457, 468 [describing role of special circumstances in California's capital scheme].) Even after the 1990 additions mandated by Propositions 114 and 115, the special circumstances "are not overinclusive by their number or terms," nor have they been construed "in an unduly expansive manner." (*People* v. *Arias, supra,* at p. 187; *People* v. *Ray, supra,* 13 Cal.4th 313, 356.) ■ There is no constitutional proscription against delegating to each district attorney the power to effectively decide in which cases to seek the death penalty (*People* v. *Bradford, supra,* 15 Cal.4th 1229, 1384; *People* v. *Barnett, supra,* at p. 1179; *People* v. *Ray, supra,* at p. 359), nor constitutional requirement of comparative sentence review (*People* v. *Jones* (1997) 15 Cal.4th 119, 193 [61 Cal.Rptr.2d 386, 931 P.2d 960]; *People* v. *Webb* (1993) 6 Cal.4th 494, 536 [24 Cal.Rptr.2d 779, 862 P.2d 779]).

■ "As to the actual killer in a felony murder, intent to kill is not legally required as a prerequisite to imposition of the death penalty." (*People* v. *Thompson* (1990) 50 Cal.3d 134, 187 [266 Cal.Rptr. 309, 785 P.2d 857]; *People* v. *Anderson* (1987) 43 Cal.3d 1104, 1146-1147 [240 Cal.Rptr. 585, 742 P.2d 1306].) Rather, in such cases, the federal Constitution does not prohibit reliance on an unintentional killing in the course of specified felonies as the basis for death eligibility. (*People* v. *Anderson, supra,* at pp. 1140, 1146; see *Tison* v. *Arizona* (1987) 481 U.S. 137, 157-158 [107 S.Ct. 1676, 1688, 95 L.Ed.2d 127] ["the reckless disregard for human life implicit in knowingly engaging in criminal activities known to carry a grave risk of death represents a highly culpable mental state, a mental state that may be taken into account in making a capital sentencing judgment when that conduct causes its natural, though also not inevitable, lethal result"].)[15]

---

[15]Contrary to defendant's assertion, the federal Constitution's Eighth Amendment imposes no requirement that a jury make an express finding that a capital defendant acted with "reckless disregard for human life." As the United States Supreme Court said in *Tison* v. *Arizona, supra,* 481 U.S. at pages 157-158 [107 S.Ct. at page 1688], such mental state is "implicit" in the knowing participation in criminal activities carrying a grave risk of death. Moreover, defendant is wrong when he asserts that this court has never addressed whether, consistent with the federal Constitution's Eighth Amendment, the death penalty can be an appropriate punishment for someone who kills *accidentally* during such activity. The purpose of our felony murder law "is to deter felons from killing negligently or accidentally [in the course of a felony] by holding them strictly responsible [for such killings]." (*People* v. *Washington* (1965) 62 Cal.2d 777, 781 [44 Cal.Rptr. 442, 402 P.2d 130]; accord, *People* v. *Pulido* (1997) 15 Cal.4th 713, 725 [63 Cal.Rptr.2d 625, 936 P.2d 1235].) Thus, we necessarily resolved this issue in *People* v. *Anderson, supra,* 43 Cal.3d at pages 1146-1147, when we concluded that the Eighth Amendment posed no impediment to subjecting the actual killer in a felony murder to the death penalty.

## V. DISPOSITION

The judgment is affirmed in its entirety.

George, C. J., Mosk, J., Baxter, J., Werdegar, J., Chin, J., and Brown, J., concurred.

Appellant's petition for review by the Supreme Court was denied September 1, 1999.